JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Brent Morgan

**DEFENDANTS**
Arion Capital Management, LLC
Larry Frascella; John Does 1-10

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Bucks County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael J. Salmanson, Esq.     Salmanson Goldshaw, P.C.
Two Penn Center, Suite 1230, 1500 JFK Blvd.
Philadelphia, PA 19102            215-640-0593

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | (15 USC 1681 or 1692) |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Breach of Employment Agreement and Violation of Pennsylvania Wage Payment and Collection Law

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
> $150,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
August 10, 2021

SIGNATURE OF ATTORNEY OF RECORD
*Michael J Salmanson*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 6900 S. Sandpiper Ave., Tucson, AZ 85746

Address of Defendant: _____ 3220 Tillman Drive, Bensalem, Suite 200, PA 19020

Place of Accident, Incident or Transaction: _____ 884 Town Center Drive, Langhorne, PA 19047

---

**RELATED CASE, IF ANY:**

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐    No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐    No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐    No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐    No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: August 10, 2021    *Michael J. Salmanson*    46707
                         *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

| | |
|---|---|
| **A.** *Federal Question Cases:* | **B.** *Diversity Jurisdiction Cases:* |
| ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts | ☑ 1. Insurance Contract and Other Contracts |
| ☐ 2. FELA | ☐ 2. Airplane Personal Injury |
| ☐ 3. Jones Act-Personal Injury | ☐ 3. Assault, Defamation |
| ☐ 4. Antitrust | ☐ 4. Marine Personal Injury |
| ☐ 5. Patent | ☐ 5. Motor Vehicle Personal Injury |
| ☐ 6. Labor-Management Relations | ☐ 6. Other Personal Injury *(Please specify):* _____ |
| ☐ 7. Civil Rights | ☐ 7. Products Liability |
| ☐ 8. Habeas Corpus | ☐ 8. Products Liability – Asbestos |
| ☐ 9. Securities Act(s) Cases | ☐ 9. All other Diversity Cases |
| ☐ 10. Social Security Review Cases | *(Please specify):* _____ |
| ☐ 11. All other Federal Question Cases *(Please specify):* _____ | |

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Michael J. Salmanson _____, counsel of record *or pro se plaintiff, do hereby certify:*

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: August 10, 2021    *Michael J. Salmanson*    46707
                         *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Brent Morgan | : | CIVIL ACTION |
| | : | NO. |
| v. | : | |
| | : | |
| Arion Capital Management, LLC | : | |
| and | : | |
| Larry Frascella | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
 and Human Services denying plaintiff Social Security Benefits.                            ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
 exposure to asbestos.                                                                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
 commonly referred to as complex and that need special or intense management by
 the court.  (See reverse side of this form for a detailed explanation of special
 management cases.)                                                                       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.            ( x )

| | | |
|---|---|---|
|  August 10, 2021 | Michael J. Salmanson | *Michael J. Salmanson* |
| **Date** | **Attorney-at-law** | **Attorney for Plaintiff** |
| 215-640-0593 | 215-640-0596 | msalmans@salmangold.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| BRENT MORGAN | : | |
| | : | Civil Action No. |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| ARION CAPITAL | : | |
| MANAGEMENT, LLC | : | |
| | : | |
| And | : | |
| | : | |
| LARRY FRASCELLA | : | |
| | : | |
| And | : | |
| | : | |
| JOHN DOES 1-10 | : | |
| | : | |
| Defendants | : | |
| _____: | | |

## COMPLAINT

Plaintiff, Brent Morgan, brings this action against Defendants, Arion Capital

Management, LLC, Larry Frascella, and John Does 1-10, and avers as follows:

## NATURE OF ACTION

1.      This case arises out of Defendants' failure to pay Plaintiff the severance required

by Plaintiff's employment agreement after his termination on January 28, 2019 in violation of

that employment agreement and the Pennsylvania Wage Payment and Collection Law, 43 P.S. §

260.1, et seq. ("WPCL").

## PARTIES

2.      Plaintiff, Brent Morgan ("Mr. Morgan"), is an individual residing in Arizona.

1

3.      Defendant Arion Capital Management, LLC ("Arion") is a Delaware Limited Liability Company with its principal place of business in Bensalem, Pennsylvania.

4.      At all times relevant to the claims set forth within, Arion was Mr. Morgan's "employer" within the meaning of the WPCL.

5.      Plaintiff was employed by Arion from February 14, 2017 until his termination on January 31, 2019.

6.      Arion is a consulting company that makes recommendations on sports wagering based on predictive models.

7.      At all times relevant to the claims set forth within, Defendant Larry Frascella ("Mr. Frascella") was the Managing Member of Arion.

8.      Mr. Frascella was a principal decision maker, policymaker, and agent of Arion as related to Mr. Morgan's wages, and specifically related to Arion's failure to pay Mr. Morgan severance.

9.      Therefore, Mr. Frascella was Mr. Morgan's "employer" within the meaning of the WPCL.

10.     Upon information and belief, one of more individuals, John Does 1-10, were also principal decision makers, policymakers, and agents of Arion as related to Mr. Morgan's wages; therefore Mr. Morgan's employer under the WPCL.

## JURISDICATION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  The parties are citizens of different States and the amount in controversy exceeds $75,000.

12.     This Court has jurisdiction over Defendants because all or a substantial portion of its actions and omissions giving rise to this lawsuit occurred in this District.

13.     This Court has personal jurisdiction over Defendant Arion because its principal place of business is located in this District.

14.     This Court has personal jurisdiction over Mr. Frascella because he resides in this District.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part or all of the events and omissions giving rise to Plaintiff's claims occurred within this district.  Alternately, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because all Defendants reside in this District.

## FACTS

16.     Arion and Mr. Morgan entered into an employment agreement ("Employment Agreement") dated February 14, 2017, which governs the terms and conditions of Mr. Morgan's employment.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit 1.

17.     Mr. Frascella signed the Employment Agreement on behalf of Arion.

18.     The Employment Agreement references Arion's operating agreement ("Operating Agreement") and adopts certain definitions in the Operating Agreement, including but not limited to, termination for "Cause".  A true and correct copy of the Operating Agreement is attached hereto as Exhibit 2.

19.     Pursuant to the Employment Agreement, Mr. Morgan's Base Salary was $150,000 per year.  See Exhibit 1, Section 5(a).

20.    Also pursuant to the Employment Agreement, Mr. Morgan is entitled to severance equal to his Base Salary if he is terminated "without Cause (as defined in the Operating Agreement)". See Exhibit 1, Section 5(c).

21.    The Operating Agreement states:

> "Cause" means the occurrence of any of the following events, as reasonably determined by the Board of Managers of the Company: (i) the failure to perform such duties as are reasonably requested in good faith by the Board of Managers; (ii) gross negligence, recklessness or willful misconduct in the performance of duties; (iii) an act of dishonest, fraudulent or illegal conduct; (iv) the breach, by Mr. Morgan, of that certain Employment Agreement by and between the Company and Mr. Morgan, dated as of the date hereof; (v) the commission of violations of Company policy including, but not limited to, policies on equal employment opportunity, non-discrimination, non-harassment, non-retaliation, and workplace violence; and (vi) the commission of violations of state or federal law or regulation in the performance of his duties to the Company.

> See Exhibit 2, Section 7.6(b).

22.    Arion terminated Mr. Morgan by letter ("Termination Letter") dated January 28, 2019, with an effective termination date of January 31, 2019. A true and correct copy of the Termination Letter is attached hereto as Exhibit 3.

23.    Mr. Frascella signed the Termination Letter on behalf of Arion.

24.    The Termination Letter states that Mr. Morgan's "employment with Arion Capital Management LLC ("Arion") will be officially terminated for cause on January 31, 2019, specifically because the company failed to reach the agreed upon benchmarks contained in the operating agreement to which you are a signatory." See Exhibit 3.

25.    However, the definition of "Cause" does not include the company's failure to meet benchmarks or any reference to benchmarks whatsoever. See Exhibit 2, Section 7.6(b).

26.     The Termination Letter relied on only one provision in the definition of Cause, Section 7.6(b)(i), which reads, "the failure to perform such duties as are reasonably requested in good faith by the Board of Managers".

27.     The Termination Letter did not contend that Mr. Morgan was terminated for "gross negligence, recklessness or willful misconduct in the performance of duties;" Section 7.6(b)(ii).

28.     The Termination Letter did not contend that Mr. Morgan was terminated for "an act of dishonest, fraudulent or illegal conduct;" Section 7.6(b)(iii).

29.     The Termination Letter did not contend that Mr. Morgan was terminated for "the breach, by Mr. Morgan, of that certain Employment Agreement by and between the Company and Mr. Morgan, dated as of the date hereof;" Section 7.6(b)(iv).

30.     The Termination Letter did not contend that Mr. Morgan was terminated for "the commission of violations of Company policy including, but not limited to, policies on equal employment opportunity, non-discrimination, non-harassment, non-retaliation, and workplace violence;" Section 7.6(b)(v).

31.     The Termination Letter did not contend that Mr. Morgan was terminated for "the commission of violations of state or federal law or regulation in the performance of his duties to the Company;" Section 7.6(b)(vi).

32.     The only fact Arion relied on to invoke Section 7.6(b)(i) was that the company was not meeting benchmarks.

33.     However, Mr. Morgan's job duties are set out in Attachment A to the Employment Agreement and, again, do not include the company meeting benchmarks or any reference to benchmarks whatsoever. See Exhibit 1, Attachment A.

34.    Mr. Morgan performed all job duties as requested by the Board of Managers to the best of his ability.

35.    The Board of Managers could not have reasonably determined that Mr. Morgan met any of the criteria for termination with "Cause" as stated in the Operating Agreement, Section 7.6(b).

36.    Mr. Morgan, through his attorney, made a demand for the unpaid severance by letter dated July 8, 2021 ("Demand Letter").   A true and correct copy of the Demand Letter is attached hereto as Exhibit 4.

37.    Mr. Frascella responded by email to Mr. Morgan's attorney on July 16, 2021 ("Response to Demand").   A true and correct copy of the Response to Demand is attached hereto as Exhibit 5.

38.    In the Response to Demand, Mr. Frascella admitted that Arion has still not developed a profitable model and that "no one that [Arion] have engaged with has been able to produce a winning model."  See Exhibit 5.

39.    In addition, Mr. Frascella admitted that Arion has "had no income. EVER." See Exhibit 5.

40.    Thus, Arion has continually failed to meet its benchmarks despite replacing Mr. Morgan over two years ago.

## COUNT I
## Breach of Contract
## (v. Defendant Arion only)

41.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

42.    The Employment Agreement constitutes a contract that Arion offered to Mr. Morgan and Mr. Morgan accepted.

43.     Mr. Morgan performed all duties according to the Employment Agreement.

44.     The Board of Managers had no reasonable basis to terminate Mr. Morgan for Cause.

45.     Arion failed to pay Mr. Morgan the severance in the amount of his Base Salary, $150,000, as required by the Employment Agreement.

WHEREFORE Plaintiff seeks judgment in his favor, and against Defendant Arion, in the form of the $150,000 severance due, together with such equitable and legal relief as the Court determines is appropriate.

## COUNT II
## PA Wage Payment and Collection Law
## (v. all Defendants)

46.     Plaintiff incorporates the preceding paragraph as though fully set forth herein.

47.     The severance payment required pursuant to the Employment Agreement constitutes wages under the Pennsylvania Wage Payment and Collection Law ("WPCL").

48.     Mr. Morgan earned wages under the Employment Agreement, including the severance payment to be paid upon his termination without Cause.

49.     Mr. Morgan was terminated without Cause.

50.     Without excuse or justification, Defendants willfully failed and refused to pay Mr. Morgan the severance in the amount of his Base Salary, $150,000, as required by the Employment Agreement.

51.     Mr. Morgan has incurred lost wages, attorney's fees and costs, and other damages as a result of the actions of Defendants.

52.    Mr. Frascella and John Does 1-10 were the principal decision makers, policymakers, and agents of Arion as related to Mr. Morgan's wages, and therefore are employers within the meaning of the WPCL.

53.    In addition to Arion, Mr. Frascella and John Does 1-10 are personally and individually liable for the unpaid wages under the WPCL.

WHEREFORE, Plaintiff seeks judgment in his favor, and against Defendants, in the form of the $150,000 severance due, prejudgment interest, 25% liquidated damages as provided under the WPCL, and reasonable attorney's fee and costs, together with such equitable and legal relief as the Court determines is appropriate.

Michael J. Salmanson, ID. 46707
SALMANSON GOLDSHAW, P.C.
Two Penn Center, Suite 1230
1500 John F. Kennedy Boulevard
Philadelphia, PA   19102
215-640-0593
215-640-0596 (fax)
msalmans@salmangold.com
Attorney for Plaintiff

# Exhibit 1

## EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS
## (AT WILL)

This Employment Agreement ("Agreement") is effective as of February 14, 2017, by and between Arion Capital Management LLC ("Company"), a Delaware limited liability company, with its principal place of business located at 884 Town Center Drive, Langhorne, PA 19047, and Brent Morgan, an individual residing at 6900 S. Sandpiper Ave., Tuscon, AZ 85746 ("Employee").

**WHEREAS**, Company desires to employ Employee on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Employee is willing to render services to Company on the terms and conditions set forth in this Agreement with respect to such employment; and

**WHEREAS**, Company desires to protect its confidential and trade secret information and to prevent unfair competition; and

**WHEREAS,** capitalized terms not defined herein shall have the meanings ascribed to them under that certain Operating Agreement of the Company, dated as of the date hereof (the "Operating Agreement"); and **[Note:  Assumes Operating Agreement will be dated same date as Employment Agreement]**

**NOW, THEREFORE**, in consideration of the premises and the terms and conditions set forth in this Agreement, Company and Employee hereby agree as follows:

1. **Employment**.  Company hereby employs Employee and Employee hereby accepts employment with Company upon the terms and conditions set forth in this Agreement.

2. **Exclusive Services**.  Employee shall devote all working time, ability, and attention to the business of Company during the term of this Agreement and shall not, directly or indirectly, render any services to, or for the benefit of, any other business, corporation, organization, or entity, whether for compensation or otherwise, without the prior knowledge and written consent of Company's Board of Managers.

3. **Duties**.  Company hereby employs Employee as Director of Analytics of the Company, in which position Employee shall perform for or on behalf of Company the duties set forth on Schedule A attached hereto and such other duties as shall be assigned by the Company's Board of Managers. Employee shall perform such duties in accordance with Company's policies and practices, including but not limited to its employment policies and practices, and subject only to such limitations, instructions, directions, and control as the Company's Board of Managers may specify from time to time at its discretion.

4. **Term**.  This Agreement is not for any definite duration.  Employee's employment with Company is "at will" meaning that either Company or Employee may terminate the relationship at any time as provided in Section 13.

5.      **Compensation**. As compensation for services rendered under this Agreement, Employee shall receive the following:

(a)     **Base Salary**. Company shall pay Employee a base salary ("Base Salary") calculated as an annual rate of $150,000.00 per year, prorated for any partial employment period, and payable in accordance with Company's regular payroll schedule, less applicable deductions and withholdings, during the term of this Agreement. The Company may increase or decrease Employee's Base Salary at any time in its reasonable discretion.

(b)     **Bonus**. Employee has the opportunity to earn a bonus on the terms and conditions set forth below:

(i)     If the Company realizes at least $5,000,000 in Net Income (as defined in the Operating Agreement) during the eighteen-month period following the date the Company begins live betting, then the Company shall issue to the Employee Class B Membership Interests representing 1.0% of the Membership Interest of the Company at a Benchmark Amount determined by the Board of Managers.

(ii)    If the Company realizes at least $10,000,000 in Net Income during the 30-month period following the date the Company begins live betting, then the Company shall issue to the Employee Class B Membership Interests representing 1.0% of the membership Interests of the Company at a Benchmark Amount determined by the Board of Managers.

(iii)   If the Company realizes at least $25,000,000 in Net Income during the 42-month period following the date the Company begins live betting, then the Company shall issue to the Employee Class B Membership Interests representing 1.0% of the membership Interests of the Company at a Benchmark Amount determined by the Board of Managers.

(iv)    If the Company realizes at least $50,000,000 in Net Income during the 54-month period following the date the Company begins live betting, then the Company shall issue to the Employee Class B Membership Interests representing 1.0% of the membership Interests of the Company at a Benchmark Amount determined by the Board of Managers.

(v)     Employee is eligible to receive each of the foregoing bonus awards set forth above in Section 5(b)(i)-(iv) once during the term of this Agreement, up to 4.0% percentage interest of the Class B Membership Interests of the Company in aggregate.

(c)     **Severance**. If Employee is terminated by Company without Cause (as defined in the Operating Agreement), the Company shall pay Employee as severance amount equal to the Employee's Base Salary, which severance amount shall be payable over the 12-month period after Employee's termination in equal amounts in accordance with the Company's regular payroll schedule, less applicable deductions and withholdings.

6.      **Benefits**. To the extent Company offers benefits, Employee shall be eligible for such benefits as are generally available to other employees of Company.

KCP-4724759-6

(a) **Vacation**. Employee shall be entitled to two weeks of vacation with full salary and benefits each calendar year, accrued prorate on a monthly basis and prorated for any partial calendar year. Employee may not accrue more than two weeks of vacation.

(b) All compensation paid under this Agreement shall be deemed to be "guaranteed payments" under the Internal Revenue Code of 1986, as amended.

7. **Reimbursement of Expenses**. Company shall reimburse Employee for reasonable business expenses necessarily incurred in the performance of his duties under this Agreement in accordance with Company policy.

8. **Confidentiality/Trade Secrets**. Employee acknowledges his position with Company is one of the highest trust and confidence, both by reason of his position and by reason of his access to and contact with the trade secrets and confidential and/or proprietary information of Company. Both during the term of this Agreement and thereafter, Employee therefore covenants and agrees as follows:

(a) He shall use his best efforts and exercise utmost diligence to protect and to safeguard the trade secrets and/or confidential and proprietary information of Company, including, but not limited to, the identity of its current and/or prospective customers, suppliers, vendors, its technical, financial, and marketing data, records, compilations of information, processes, programs, methods, techniques, and specifications relating to its customers, suppliers, vendors, and services (collectively, "Proprietary Information"), but Proprietary Information shall not include information that (i) is or becomes part of the public domain other than as a result of disclosure by Employee, (b) becomes available to Employee on a non-confidential basis from a source other than Company, provided that such source has the lawful right to disclose such information to Employee, or (c) was in Employee's possession prior to disclosure of the same by Company.

(b) He shall not disclose any of Company's Proprietary Information, except as may be required in the course of his employment with Company or by law; provided that if Employee is required to disclose by law; he must give Company as much notice as possible to ensure Company has the opportunity to protect its interests; and

(c) He shall not use, directly or indirectly, for his own benefit or for the benefit of another, any of Company's Proprietary Information.

(d) All files, records, documents, specifications, memoranda, notes, or other documents relating to the business of Company, whether prepared by Employee or otherwise coming into his possession, shall be the exclusive property of Company and shall be delivered to Company and not reproduced and/or retained by Employee upon termination of his employment for any reason whatsoever or at any other time upon request of Company.

9. **Inventions**. Employee covenants and agrees he will fully inform Company of and disclose to Company all inventions, designs, improvements, discoveries conceptions, innovations, methods, know-how, ideas, writings, processes, or other creations or works of authorship ("Inventions") that he has now or may hereafter have during his employment with Company and that pertain to or relate to the business of Company or to any experimental work,

3

KCP-4724759-6

products, services, or processes of Company in progress or planned for the future, whether conceived by Employee alone or with others and whether conceived during regular working hours or in conjunction with the use of any Company assets. All such Inventions shall be the exclusive property of Company regardless of whether patent or trademark applications are filed thereon. Employee assigns to the Company all right, title and interest Employee may have or may acquire in and to all Inventions including, without limitation, all patent rights, copyright rights, trade secret rights, and all other intellectual property rights therein. Employee shall assist Company, at any time during or after his employment, in obtaining patents on all such Inventions deemed patentable by Company and shall execute all documents and do all things necessary to obtain letters patent, vest Company with full and exclusive title thereto, and protect the same against infringement by others. If the Company requires any assistance after termination of Employee's employment, Employee will be compensation for time actually spent in providing that assistance at an hourly rate equivalent to Employee's salary or wages during the last period of employment with the Company. If the Company is unable to secure Employee's signature on any document necessary to apply for, prosecute or obtain or enforce any patent, copyright, or other right or protection relating to any Invention, whether due to Employee's mental or physical incapacity or any other cause, Employee hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as Employee's agent and attorney-in-fact, to act for and in Employee's behalf to execute and file any such document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights, or other rights or protections, with the same force and effect as if executed and delivered by Employee.

10. **Non-Solicitation**. Employee agrees that, during the period of his employment and for two (2) years after termination of Employee's employment for any reason by either Company or Employee, he will not, either directly or indirectly, for himself or for any third party, except as otherwise agreed to in writing by Company; (a) solicit, induce, recruit, or cause (or attempt to solicit, induce, recruit, or cause) any person who is then employed by Company to terminate his/her employment with the Company; or (b) solicit, induce, recruit, divert, take away, or do business with (or attempt to solicit, induce, recruit, divert, take away, or do business with) any customer of Company and/or any prospective customer of Company after the date hereof and prior to the date of Employee's termination. If during the non-compete period, Company ceases its on-going operations, Employee's covenant not to compete will terminate; provided however, that Employee must notify Company in writing before such termination is effective and give Company an opportunity to deny cessation of business.

11. **Non-Competition**. Employee agrees that, during the period of his employment and for two (2) years after termination of Employee's employment for any reason by either Company or Employee, he will not, directly or indirectly on behalf of Employee or on behalf of a third party, except as otherwise agreed to in writing by Company: (a) compete with the business of Company (computer-assisted wagering on horse races) whether as an employee, employer, consultant, agent, principal, partner, shareholder, corporate officer, director, or through any other kind of ownership (other than ownership of securities of publicly-held corporations of which Employee owns less than two percent (2%) of any class of outstanding securities) or in any other representative or individual capacity; or (b) engage in or render any services to any business engaged in Company's current industry or any industry in which Company becomes involved or is considering becoming involved from the date hereof until the

4

conclusion of Employee's employment. It is expressly understood that, given the worldwide nature of Company's business and the limited nature of Company's competition, there is no geographic restriction on this Paragraph.

12.     **Remedies for Breach of Covenants of Employee**.

(a)     Company and Employee specifically acknowledge and agree that the foregoing covenants of Employee in Sections 8 through 11 are reasonable in content and scope and are given by Employee knowingly, willingly, voluntarily, and for adequate and valid consideration. Company and Employee further acknowledge and agree that, if any court of competent jurisdiction or other appropriate authority disagrees with the parties' foregoing agreement as to reasonableness, then such court or other authority shall reform or otherwise modify the foregoing covenants of the Employee in Sections 8 through 11 only so far as necessary to be enforceable as reasonable, notwithstanding and regardless of any law or authority to the contrary.

(b)     The covenants set forth in Sections 8 through 11 of this Agreement shall continue to be binding upon Employee notwithstanding the termination of his employment with Company for any reason by either party. Such covenants shall be deemed and construed as separate agreements independent of any other provisions of this Agreement and any other agreement between Company and Employee. The existence of any claim or cause of action by Employee against Company shall not constitute a defense to the enforcement by Company of any or all such covenants. It is expressly agreed that the remedy at law for the breach of any such covenant is inadequate, that Employee shall not defend against any claim by Company on the basis of an adequate remedy of law, that injunctive relief and specific performance shall be available to prevent the breach or any threatened breach thereof, and that the Company shall not be required to post bond in pursuit of such claim. The parties agree that if Company prevails in any action to enforce any provision of Sections 8 through 11 that Company shall be entitled to an award against Employee for its reasonable expenses (including, without limitation, reasonable attorneys' fees, costs, expert fees, and disbursements) in pursuing such action notwithstanding and regardless of any law to the contrary.

13.     **Termination**. This Agreement (other than Sections 8 through 13 hereof, which shall survive any termination hereof for any reason) may be terminated by either Company or Employee at any time by providing notice as set forth in Paragraph 15 below.

14.     **Transition of Work**. Upon termination for any reason, Employee (i) agrees to provide reasonable cooperation to Company in winding up Employee's work for Company and transferring that work to other individuals as designated by Company, and (ii) agrees to provide reasonable cooperation with Company in litigation based on acts or events arising during Employee's employment with Company, if requested by Company.

5

15.   **Notices**.  Any notices to be given hereunder by either party to the other shall be in writing and may be effected (i) by personal delivery, (ii) by mail, registered or certified, postage prepaid, with return receipt requested, (iii) by overnight courier, or (iii) by e-mail with a delivery and read receipt.   Notices shall be addressed as follows:

    (a)   If to Company:

        Arion Capital Management
        884 Town Center Drive
        Langhorne, PA 19047
        Attn:  Larry Frascella
        E-mail:  larry.frascella@gmail.com

    (b)   If to Employee:

        Brett Morgan
        6900 S. Sandpiper Ave.
        Tuscon, AZ 85746
        E-mail:  _____

Either party may change its address for notice by giving notice in accordance with the terms of this Section.

16.   **General Provisions**.

    (a)   **Governing Law and Consent to Jurisdiction**.  This Agreement and all disputes relating to Employee's employment with Company shall be subject to, governed by, and construed in accordance with the laws of the State of Pennsylvania irrespective of any choice of law and/or of the fact that one or both of the parties now is or may become a resident of a different state.  Employee hereby expressly submits and consents to the exclusive personal jurisdiction and exclusive venue of the federal and state courts of competent jurisdiction in the State of Pennsylvania.

    (b)   **Invalid Provisions**.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable, then such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and still be legal, valid or enforceable.

    (c)   **Construction of Agreement**.  This Agreement sets forth the entire understanding of the parties and supersedes all prior agreements or understandings, whether written or oral, with respect to the subject matter hereof.  No terms, conditions, warranties, other than those contained herein, and no amendments or modifications hereto shall be binding unless

made in writing and signed by the parties hereto. This Agreement shall not be strictly construed against either party.

(d)     **Binding Effect**. This Agreement shall extend to and be binding upon and inure to the benefit of the parties hereto, their respective heirs, representatives, successors, and assigns. This Agreement may not be assigned by Employee, but may be assigned by Company to any person or entity that succeeds to the ownership or operation of the business in which Employee is primarily employed by Company.

(e)     **Waiver**. The waiver by either party hereto of a breach of any term or provision of this Agreement shall not operate or be construed as a waiver of a subsequent breach of the same provision by any party or of the breach of any other term or provision of this Agreement.

(f)     **Titles**. Titles of the Sections herein are used solely for convenience and shall not be used for interpretation or construing any work, clause, paragraph, or provision of this Agreement.

(g)     **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, Company and Employee have executed this Agreement as of the date and year first above written.

**EMPLOYEE**:                                              **COMPANY**:

Name: Brent Morgan

**ARION CAPITAL MANAGEMENT LLC**

By:

Name: LARRY FRASCELLA

Title: MANAGING MEMBER

KCP-4724759-6

## Schedule A

**Job Description**

- Responsible for all modeling efforts, which involves feature extraction, feature engineering, regression modeling, machine learning, wager optimization models, market prediction (including econometrics).

- Responsible for all SQL/database management of the data from TrackMaster, Amtote, involving data parsing, cleaning and organization for both back-end (research) and production environments.

- Daily monitoring of bet files and bug-monitoring constantly to maintain error-less production environments.

- Innovation to solve problems in a niche space and niche market, using data-driven modeling towards a professional gambling "advantage player" mindset.

- Knowledge of the sports modeling (after visiting the tracks, having discussions with already successful CAW players, certain knowledge and information to be used).

- Management of tasks for consultants who are hired by the Company and who are subject matter experts in either horse racing and general data analysis, or other sports games, or statistics/probability, machine learning, or another mathematical expertise, computer engineering and software.

- Identify future consultants to assist on specific tasks.

- Responsible for all project management documentation to ensure anyone is able to monitor progress at any given time, when desirable.

# Exhibit 2

# OPERATING AGREEMENT

# OF

# ARION CAPITAL MANAGEMENT, LLC

**The Membership Interests referred to in this limited liability company agreement have not been registered under the Securities Act of 1933 or any other securities laws, and such Membership Interests may not be transferred without appropriate registration or the availability of an exemption from such registration requirements.**

KCP-4708754-8

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................................1
   1.1   **Terms Defined Herein** ................................................................................1
   1.2   **Other Definitional Provisions** ...................................................................6

ARTICLE II BUSINESS PURPOSES AND OFFICES ......................................................6
   2.1   **Name; Business Purpose**............................................................................6
   2.2   **Powers** .......................................................................................................6
   2.3   **Principal Office** .........................................................................................6
   2.4   **Registered Office and Registered Agent** ..................................................6
   2.5   **Amendment of the Articles** .......................................................................6
   2.6   **Effective Date** ............................................................................................6
   2.7   **Liability of Members** .................................................................................6

ARTICLE III MEMBERSHIP INTERESTS ........................................................................7
   3.1   **Membership Interests** ................................................................................7
   3.2   **Additional Capital Contributions** .............................................................7
   3.3   **Capital Accounts** .......................................................................................8
   3.4   **Capital Withdrawal Rights, Interest and Priority** ....................................9

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS .....................................................9
   4.1   **Non-Liquidation Cash Distributions** ........................................................9
   4.2   **Liquidation Distributions** .........................................................................10
   4.3   **Income, Losses and Distributive Shares of Tax Items** .............................10
   4.4   **Allocation of Income, Loss and Credits** ...................................................11
   4.5   **Special Rules Regarding Allocation of Tax Items** ...................................11
   4.6   **No Priority** ................................................................................................14
   4.7   **Tax Withholding** .......................................................................................14
   4.8   **Reserves** ....................................................................................................14

ARTICLE V MANAGEMENT ...............................................................................................15
   5.1   **Management** ...............................................................................................15
   5.2   **Election of the Board of Managers** ...........................................................15
   5.3   **Meetings of the Board of Managers; Place of Meetings** ..........................16
   5.4   **Quorum; Voting Requirement** ...................................................................16
   5.5   **Notice of Meeting** .....................................................................................16
   5.6   **Waiver of Notice** .......................................................................................16
   5.7   **Action Without a Meeting** .........................................................................16
   5.8   **Compensation of Managers** .......................................................................16
   5.9   **Meetings of Members; Place of Meetings** ................................................16
   5.10  **Quorum; Voting Requirement** ...................................................................17
   5.11  **Proxies** .......................................................................................................17
   5.12  **Action Without Meeting** ...........................................................................17
   5.13  **Notice of Meetings** ....................................................................................17
   5.14  **Waiver of Notice** .......................................................................................17

5.15  Execution of Documents Filed with Department of State of Delaware and Waiver of Receipt of Copy of Filed Documents .......................................17
5.16  Limitation of Liability; Indemnification ...........................................17
5.17  Other Business Ventures .................................................................20

ARTICLE VI ACCOUNTING AND BANK ACCOUNTS .......................................21
6.1  Fiscal Year ..........................................................................21
6.2  Books and Records ....................................................................21
6.3  Financial Reports ....................................................................21
6.4  Tax Returns and Elections; Tax Matters Member .........................................21
6.5  Section 754 Election ..................................................................21
6.6  Bank Accounts ........................................................................22

ARTICLE VII TRANSFERS AND ISSUANCES OF MEMBERSHIP INTERESTS; WITHDRAWAL ...................................................................22
7.1  Permitted Transfers ..................................................................22
7.2  Substitute Members ...................................................................22
7.3  Effect of Admission as a Substitute Member ...........................................22
7.4  Additional Members and Membership Interests; Preemptive Rights ........................23
7.5  Redemption of Membership Interests ...................................................23
7.6  Company Call Rights ..................................................................23
7.7  Withdrawal ...........................................................................24

ARTICLE VIII DISSOLUTION AND TERMINATION ......................................24
8.1  Events Causing Dissolution ...........................................................24
8.2  Effect of Dissolution ................................................................24
8.3  Application of Proceeds ..............................................................24

ARTICLE IX MISCELLANEOUS ......................................................25
9.1  Title to the Property ................................................................25
9.2  Nature of Interest in the Company ....................................................25
9.3  Notices ..............................................................................25
9.4  Waiver of Default ....................................................................25
9.5  No Third Party Rights ................................................................25
9.6  Entire Agreement .....................................................................25
9.7  Amendments to Certificate of Formation and this Agreement ............................26
9.8  Severability .........................................................................26
9.9  Binding Agreement ....................................................................26
9.10  Headings ............................................................................26
9.11  Counterparts ........................................................................26
9.12  Governing Law .......................................................................26
9.13  Remedies ............................................................................26
9.14  Waiver of Jury Trial ................................................................27

SCHEDULE A ....................................................................35

ii

# OPERATING AGREEMENT
## OF
## ARION CAPITAL MANAGEMENT, LLC

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into as of [•], 2016 by and between the persons set forth on Schedule A attached hereto.

## RECITALS:

WHEREAS, Arion Capital Management, LLC, a Delaware liability company (the "Company"), has been formed as a limited liability company under the laws of the State of Delaware; and

WHEREAS, in connection with the acquisition of the membership interests of the Company as of the date hereof by the Members set forth hereto on Schedule A, as permitted under the Act and this Agreement, the Members have adopted this Agreement as of the date first written above.

## AGREEMENT:

In consideration of the premises and the mutual agreements contained herein, the persons set forth on the signature page attached hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Terms Defined Herein**.  As used herein, the following terms shall have the following meanings, unless the context otherwise specifies:

"**Act**" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101 *et seq*., as amended from time to time, and any successor to such Act.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (i) increased for any amounts such Member is unconditionally obligated to restore and the amount of such Member's share of Company Minimum Gain and Member Minimum Gain after taking into account any changes during such year; and (ii) reduced by the items described in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Agreement**" means this Operating Agreement of the Company, as amended from time to time.

"**Articles**" means the Certificate of Formation of the Company filed with the Delaware Secretary of State, as amended from time to time.

"**Available Cash**" means the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company derived from the day to day operations of the

Company (and specifically excluding Liquidation Proceeds) that the Board of Managers determines is available for distribution to the Members after taking into account any amount required or appropriate to maintain a reasonable amount of Reserves. For the avoidance of doubt, when distributing funds pursuant to or in accordance with Section 4.2(c), Available Cash will be deemed to include Liquidation Proceeds.

"**Benchmark Amount**" shall mean an amount specified by the Board of Managers with respect to each Class B Membership Interests issued pursuant to this Agreement.

"**Board of Managers**" means the group of Managers elected pursuant to Article V to manage the business and affairs of the Company.

"**Capital Account**" means the separate account established and maintained by the Company for each Member and each Transferee pursuant to Section 3.3.

"**Capital Contributions Balance**" means the aggregate capital contributions made by a Member, less Distributions received pursuant to Section 4.1(a)(i).

"**Cause**" shall have the meaning set forth in Section 7.6(b).

"**Class A Member**" means the Class A Members identified on Schedule A hereto and their permitted successors or assigns, and any additional Class A Member admitted to the Company after the date hereof in accordance with this Agreement.

"**Class A Membership Interests**" shall mean the Membership Interests representing the right to receive distributions pursuant to Section 4.1(a), together with all allocations corresponding thereto.

"**Class B Member**" means the Class B Members identified on Schedule A hereto and their respective successors or assigns, and any additional Class B Member admitted to the Company after the date hereof and in accordance with this Agreement.

"**Class B Membership Interests**" shall mean the Membership Interests representing the right to receive distributions pursuant to Section 4.1(a), and subject to the limitations set forth in Section 4.1(b), together with all allocations corresponding thereto.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of future laws.

"**Company Minimum Gain**" shall have the same meaning as partnership minimum gain set forth in Treasury Regulation § 1.704-2(d)(1). Company Minimum Gain shall be determined, first, by computing for each Nonrecourse Debt any gain that the Company would realize if the Company disposed of the property subject to that liability for no consideration other than full satisfaction of such liability and, then, aggregating the separately computed gains. For purposes of computing gain, the Company shall use the basis of such property that is used for purposes of determining the amount of the Capital Accounts under Section 3.3 hereof. In any taxable year in which a Revaluation occurs, the net increase or decrease in Company Minimum Gain for such taxable year shall be determined by: (1) calculating the net decrease or increase in Company

2

Minimum Gain using the current year's book value and the prior year's amount of Company Minimum Gain, and (2) adding back any decrease in Company Minimum Gain arising solely from the Revaluation.

"**Contributing Members**" shall have the meaning set forth in Section 3.2(c) of this Agreement.

"**Credits**" means all tax credits allowed by the Code with respect to activities of the Company or the Property.

"**Distributions**" means any distributions by the Company to the Members of Available Cash or Liquidation Proceeds or other amounts.

"**Fair Market Value**" means the price at which a Membership Interests would change hands between a hypothetical willing and able buyer and a willing and able seller, acting at arm's length in an open and unrestricted market, with neither being under compulsion to buy or sell and when both have reasonable knowledge of relevant facts.

"**Fair Value**" of an asset means its Fair Market Value.

"**Income**" and "**Loss**" mean, respectively, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code § 703(a), except that for this purpose (i) all items of income, gain, deduction or loss required to be separately stated by Code § 703(a)(1) shall be included in taxable income or loss; (ii) tax exempt income shall be added to taxable income or loss; (iii) any expenditures described in Code § 705(a)(2)(B) (or treated as Code § 705(a)(2)(B) expenditures pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing taxable income or loss shall be subtracted; and (iv) taxable income or loss shall be adjusted to reflect any item of income or loss specifically allocated in Article IV.

"**Liquidation Proceeds**" means all Property at the time of liquidation of the Company and all proceeds thereof.

"**Liquidator**" shall have the meaning set forth in Section 4.2(b).

"**Majority in Interest**" means any Class A Member or group of Class A Members holding an aggregate of more than fifty percent (50%) of the outstanding Class A Membership Interests of the Company.

"**Manager**" means each of the natural persons elected pursuant to Article V to serve on the Board of Managers.

"**Member**" means each Person executing this Agreement as a Class A Member or Class B Member and each Person who is subsequently admitted to the Company as a Member pursuant to this Agreement.

"**Member Minimum Gain**" shall have the same meaning as partner nonrecourse debt minimum gain as set forth in Treasury Regulation § 1.704-2(i)(3). With respect to each Member

3

Nonrecourse Debt, Member Minimum Gain shall be determined by computing for each Member Nonrecourse Debt any gain that the Company would realize if the Company disposed of the property subject to that liability for no consideration other than full satisfaction of such liability. For purposes of computing gain, the Company shall use the basis of such property that is used for purposes of determining the amount of the Capital Accounts under Section 3.3 of this Agreement.  In any taxable year in which a Revaluation occurs, the net increase or decrease in Member Minimum Gain for such taxable year shall be determined by:  (1) calculating the net decrease or increase in Member Minimum Gain using the current year's book value and the prior year's amount of Member Minimum Gain, and (2) adding back any decrease in Member Minimum Gain arising solely from the Revaluation.

"**Member Nonrecourse Debt**" shall have the same meaning as partner nonrecourse debt set forth in Treasury Regulation § 1.704-2(b)(4).

"**Member Nonrecourse Deductions**" shall have the same meaning as partner nonrecourse deductions set forth in Treasury Regulation § 1.704-2(i)(2).  Generally, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a fiscal year equals the net increase during the year in the amount of the Member Minimum Gain (determined in accordance with Treasury Regulation § 1.704-2(i)) reduced (but not below zero) by the aggregate distributions made during the year of proceeds of Member Nonrecourse Debt and allocable to the increase in Member Minimum Gain determined according to the provisions of Treasury Regulation § 1.704-2(i).

"**Membership Interest**" is a measure of the relative ownership by the Members in the Company and refers to all of a Member's rights and interests in the Company in such Member's capacity as a Member, all as provided in the Articles, this Agreement and the Act, including, without limitation, the Member's interest in the capital, income, gain, deductions, losses, and credits of the Company.

"**Minimum Gain Chargeback Requirement**" shall have the meaning set forth in Section 4.5(b).

"**Net Income**" shall have the meaning set forth in Section 7.6(c).

"**Net Taxable Income**" shall mean with respect to each Member for a particular Company tax year the excess, if any, of (i) such Member's share of the Company's net taxable income allocated to such Member, over (ii) the aggregate amount of such Member's share of the Company's net taxable loss for all prior years which has not been previously utilized to offset such Member's share of the Company's Net Taxable Income for any previous year.  For these purposes, Members shall include any predecessor in interest with respect to the applicable Membership Interests and the computation of taxable income shall be based upon the Fair Value of property contributed to the Company in exchange for Membership Interests.

"**Non-Contributing Member**" shall have the meaning set forth in Section 3.2(c) of this Agreement.

"**Nonrecourse Debt**" means a Company liability with respect to which no Member bears the economic risk of loss as determined under Treasury Regulation §§ 1.752-1(a)(2) and 1.752-2.

"**Nonrecourse Deductions**" shall have the same meaning as nonrecourse deductions set forth in Treasury Regulation § 1.704-2(c). Generally, the amount of Nonrecourse Deductions for a fiscal year equals the net increase in the amount of Company Minimum Gain (determined in accordance with Treasury Regulation § 1.704.2(d)) during such year reduced (but not below zero) by the aggregate distributions made during the year of proceeds of a Nonrecourse Debt that are allocable to the increase in Company Minimum Gain, determined according to the provisions of Treasury Regulation § 1.704-2(c) and (h).

"**Notice**" shall have the meaning set forth in Section 9.3.

"**Person**" means any individual, partnership, limited liability company, corporation, cooperative, trust or other entity.

"**Property**" means all properties and assets that the Company may own or otherwise have an interest in from time to time.

"**Reserves**" shall have the meaning set forth in Section 4.8 of this Agreement.

"**Substitute Member**" shall have the meaning set forth in Section 7.2.

"**Tax Distribution Amount**" shall mean with respect to each Member an amount equal to the product of (i) such member's Net Taxable Income with respect to such tax year of the Company, times (ii) the Tax Rate.

"**Tax Matters Member**" means the Person designated pursuant to Section 6.4 to represent the Company in matters before the Internal Revenue Service.

"**Tax Rate**" shall mean the sum of (i) maximum applicable marginal Federal income tax rate, (ii) 3.8%; and (iii) the maximum effective local and state marginal income tax rates for individuals residing in the Commonwealth of Pennsylvania.

"**Third Party**" means a Person that is not an affiliate of the Company or a Member.

"**Transfer**" means (i) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, and (ii) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law or otherwise. Transfers shall include, without limitation, a Transfer with respect to the ownership or equity of a Member or a Member's equity owner or other controlling party.

"**Transferee**" shall have the meaning set forth in Section 7.2 of this Agreement.

"**Transferor**" shall mean any Member that transfers Membership Interests.

"**Treasury Regulations**" means the regulations promulgated by the Treasury Department of the United States of America with respect to the Code, as such regulations are amended from time to time, or the corresponding provisions of future regulations.

"**Unfunded Amount**" shall have the meaning set forth in Section 3.2(c) of this Agreement.

**1.2    Other Definitional Provisions**.

(a)    As used in this Agreement, accounting terms not defined in this Agreement, and accounting terms partly defined to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.

(b)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(c)    Words of the masculine gender shall be deemed to include the feminine or neuter genders, and vice versa, where applicable. Words of the singular number shall be deemed to include the plural number, and vice versa, where applicable.

## ARTICLE II
## BUSINESS PURPOSES AND OFFICES

**2.1    Name; Business Purpose**. The name of the Company shall be as stated in the Articles. The Company is formed for the purpose of conducting any and all business permitted to be conducted by the Act and applicable law, all in accordance with this Agreement.

**2.2    Powers**. In addition to the powers and privileges conferred upon the Company by law and those incidental thereto, the Company shall have the same powers as a natural person to do all things necessary or convenient to carry out its business and affairs.

**2.3    Principal Office**. The principal office of the Company shall be located at such place as the Board of Managers may determine from time to time.

**2.4    Registered Office and Registered Agent**. The location of the registered office and the name of the registered agent of the Company in the State of Delaware shall be as stated in the Articles. The registered office and registered agent of the Company may be changed, from time to time, by the Board of Managers.

**2.5    Amendment of the Articles**. The Company shall amend the Articles at such time or times and in such manner as may be required by the Act and this Agreement.

**2.6    Effective Date**. This Agreement shall be effective upon the date first set forth above.

**2.7    Liability of Members**. No Member or Manager, solely by reason of being a Member or Manager, or both, shall be liable, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any other Member, Manager, agent, or employee of the Company. The failure of the Company to observe any formalities or requirements relating

to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing liability on the Members or Managers for the debts, obligations, or liabilities of the Company.

## ARTICLE III
## MEMBERSHIP INTERESTS

**3.1    Membership Interests**.

(a)    Each Member acknowledges and agrees that each Member will have the Membership Interests set forth opposite such Member's name on Schedule A attached hereto. All future Class B Members shall be assigned a Benchmark Amount at the time of the issuance of Class B Membership Interests to such Members.

(b)    The Company intends that the Class B Membership Interests will be treated as "profits interests" for U.S. federal income tax purposes within the meaning of Revenue Procedure 93-27, 1993-C.B. 343.  In accordance with Revenue Procedure 2001-43, 2001-2 CB 191, the Company shall treat such Member as the owner of such Membership Interests and such individuals listed on Schedule A.  Each Class B Member hereby agrees to make a timely election under Code Section 83(b).  Because these Class B Membership Interests are intended to be "profits interests" for U.S. federal income tax purposes, it is anticipated that the amount of gross income to be included by the holders of Class B Membership Interests with respect to the Code Section 83(b) election is zero.

**3.2    Additional Capital Contributions.**

(a)    Upon the request of the Board of Managers, each of James Carnes, Larry Frascella, and David Frascella agree to make, on an aggregate basis, up to $500,000.00 of capital contributions, in such proportions determined at the discretion of Messrs. Carnes, L. Frascella, and D. Frascella.

(b)    Following the contributions of capital pursuant to Section 3.2(a), the Company may, at the discretion of the Board of Managers, require the Class A Members to make additional capital contributions to the Company in such amounts determined by the Board of Managers.

(c)    If any Class A Member fails for any reason to timely satisfy all or any part of a capital contribution, such Class A Member shall be deemed to be a "Non-Contributing Member." The Board of Managers shall promptly give written notice of the Non-Contributing Member's failure to contribute to the other Class A Members (the "Contributing Members") specifying the amount the Non-Contributing Member failed to contribute (the "Unfunded Amount"). The Contributing Members shall then have the right, but not the obligation, for a period of ten (10) days after receipt of such notice, to contribute to the Company an amount equal to the Unfunded Amount. If the Contributing Member elects to fund the Unfunded Amount, then the Class A Membership Interests of the Class A Members shall be adjusted to reflect their relative aggregate capital contribution.  By way of example only, if (1) each Class A Member held a 20%

7

Membership Interest and had previously contributed $1,000,000 to the capital of the Company, (2) the Company requires a capital contribution pursuant to Section 3.2(b) of $250,000 from each of the Class A Members, and (3) one Class A Member failed to fund such capital contribution and the other Class A Members funded 100% of the Non-Contributing Members capital contribution on a pro rata basis, then the Class A Membership Interests of the Class A Members as set forth on Schedule A shall be adjusted as follows:

$$\text{Class A Membership Interests of the applicable Member} = \frac{\text{Total Contributions by Contributing/Non-Contributing Member}}{\text{Total Contributions by Members}}$$

As a result the Non-Contributing Member's Class A Membership Interests would be adjusted to

$$\text{Class A Membership Interests of the Non-Contributing Member} = \frac{1,000,000}{6,250,000} = 16\%$$

As a result each Contributing Members' Class A Membership Interests would be adjusted to:

$$\text{Class A Membership Interests of the Contributing Member} = \frac{1,312,500}{6,250,000} = 21\%$$

**3.3    Capital Accounts**.  A separate Capital Account shall be maintained for each Member and each Transferee.  The initial Capital Account for each Member is set forth on Schedule A. Each Member's Capital Account shall be (a) increased by (i) the amount of money contributed by such Member, (ii) the Fair Value of property contributed by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code § 752), (iii) allocations to such Member, pursuant to Article IV, of Company income and gain (or items thereof), and (iv) to the extent not already netted out under clause (b)(ii) below, the amount of any Company liabilities assumed by the Member or which are secured by any property distributed to such Member; and (b) decreased by (i) the amount of money distributed to such Member, (ii) the Fair Value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code § 752), (iii) allocations to such Member, pursuant to Article IV, of Company loss and deductions (or items thereof), and (iv) to the extent not already netted out under clause (a)(ii) above, the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In the event any Membership Interests are transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it

relates to the transferred interest and the Capital Account of each Transferee shall be increased and decreased in the manner set forth above.

In the event of (x) an additional capital contribution by an existing or an additional Member of more than a de minimis amount that results in a shift in Membership Interests, (y) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for a Membership Interests or a distribution of property other than money or (z) the liquidation of the Company within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(g), the book basis of the Property shall be adjusted to Fair Value and the Capital Accounts of all the Members shall be adjusted simultaneously to reflect the aggregate net adjustment to book basis as if the Company recognized gain or loss equal to the amount of such aggregate net adjustment; provided, however, that the adjustments resulting from clause (x) or (y) above shall be made only if (and to the extent) the Board of Managers determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members.

In the event that Property is subject to Code § 704(c) or is revalued on the books of the Company in accordance with the preceding paragraph pursuant to § 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, the Members' Capital Accounts shall be adjusted in accordance with § 1.704-1(b)(2)(iv)(g) of the Treasury Regulations for allocations to the Members of depreciation, amortization and gain or loss, as computed for book purposes (and not tax purposes) with respect to such Property.

The foregoing provisions of this Section 3.3 and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Treasury Regulation §§ 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event it is determined by the Board of Managers that it is prudent or advisable to modify the manner in which the Capital Accounts, or any increases or decreases thereto, are computed in order to comply with such Treasury Regulations, the Board of Managers may cause such modification to be made provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company, and the Board of Managers, upon any such determination by the Members, is empowered to amend or modify this Agreement, notwithstanding any other provision of this Agreement.

**3.4    Capital Withdrawal Rights, Interest and Priority**.   Except as expressly provided in this Agreement, no Member shall be entitled to withdraw or reduce such Member's Capital Account or to receive any Distributions. No Member shall be entitled to demand or receive any Distribution in any form other than in cash. No Member shall be entitled to receive or be credited with any interest on the balance in such Member's Capital Account at any time. Except as may be otherwise expressly provided herein, no Member shall have any priority over any other Member as to the return of the balance in such Member's Capital Account.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

**4.1    Non-Liquidation Cash Distributions**.

KCP-4708754-8

(a)    Subject to Section 4.1(b), the amount, if any, of Available Cash shall be determined by the Board of Managers and shall be distributed to the Members at the times and in the amounts determined by the Board of Managers (i) first, pro rata in accordance with their respective Capital Contribution Balance and (ii) second, pro rata in accordance with their respective Membership Interests.

(b)    A Class B Member shall not receive distributions pursuant to Section 4.1(a) in respect of such Membership Interests until the Class A Members receive on an aggregate basis, Distributions equal to the Benchmark Amount in respect of the Class B Membership Interests held by such Class B Member.

(c)    Notwithstanding Section 4.1(a) and Section 4.1(b) above, to the extent funds are available, the Company shall distribute periodically to match the time for making estimated tax payments to each Member an amount equal to such Member's Tax Distribution Amount; provided that, no Distributions shall be made with respect to income allocated in connection with a sale by the Company of all or substantially all of the Company's assets. There can be no assurance, however, that such distributions will be made, or if made, will fully satisfy a Member's tax liabilities attributable to allocations of taxable income hereunder.   If the Company does not have sufficient cash to make distributions of the Tax Distribution Amount to all Members, then the Company will make such Distribution of cash to the Members pro rata in proportion to the respective amounts due to them under this Section 4.1(c), and the Company shall make up any shortfall in any Distribution of Tax Distribution Amounts at such times as the Company has sufficient cash to fund such distributions. The Distribution under this Section 4.1(c) shall be treated as an advance on Distributions under Section 4.1(a)(ii), and Distributions under Section 4.1(a)(ii) shall be deemed to satisfy the Distribution obligations under this Section 4.1(c).

**4.2    Liquidation Distributions**.    Liquidation Proceeds shall be distributed in the following order of priority:

(a)    To the payment of debts and liabilities of the Company (including to Members to the extent otherwise permitted by law) and any expenses of liquidation.

(b)    Next, as necessary, to the setting up of such reserves as the Person required or authorized by law to wind up the Company's affairs (the "Liquidator") may reasonably deem necessary or appropriate for any disputed, contingent or unforeseen liabilities or obligations of the Company, provided that any such reserves shall be paid over by the Liquidator to an independent escrow agent, to be held by such agent or its successor for such period as the Liquidator shall deem advisable for the purpose of applying such reserves to the payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided.   Each action of the Liquidator pursuant to this Section 4.2(b) must be approved by a Majority in Interest of the Members.

(c)    The remainder to the Members pursuant to Section 4.1(a) above.

**4.3    Income, Losses and Distributive Shares of Tax Items**.   The Company's Income or Loss, as the case may be, for each fiscal year of the Company, as determined in accordance

10

KCP-4708754-8

with such method of accounting as may be adopted for the Company pursuant to Article VI hereof, shall be allocated to the Members for both financial accounting and income tax purposes as set forth in this Article IV, except as otherwise provided for herein or unless all Members agree otherwise.

4.4    **Allocation of Income, Loss and Credits**.

(a)    After giving effect to the special allocations required under Sections 4.5(b)-(h) hereof, Income and Loss (and, to the extent necessary, individual items of gross income, gain, deduction, loss or credit) for each fiscal year or other accounting period of the Company shall be allocated among the Members in a manner that will, as nearly as possible, cause the Capital Account balance of each such Member at the end of such accounting period to equal the hypothetical distribution, if any, that such Member would receive if, on the last day of such period: (x) all of the Company's assets, including cash, were sold for cash equal to their book values (as determined for purposes of maintaining Capital Accounts in accordance with Section 3.3 hereof); (y) all Company liabilities reflected on the face of the Company's balance sheet were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the book value (as so determined) of the Company assets securing such liability); and (z) the net remaining proceeds thereof were distributed in full to the Members in the order of priority described in Section 4.2(c) hereof. For purposes of determining Capital Accounts under this Section, (i) Capital Accounts shall first be reduced by any Distributions during such period other than Distributions pursuant to Section 4.2 hereof, and (ii) a Member's Capital Account balance shall be deemed to be increased by such Member's share of Company Minimum Gain and Member Minimum Gain, if any, determined as of the end of such accounting period. Notwithstanding anything in this Section to the contrary, Income and Losses (and, to the extent necessary, individual items of gross income, gain, deduction, loss or credit) realized by the Company in connection with a change in control or the liquidation or dissolution and termination of the Company shall be allocated to the extent possible in a manner so as to cause the positive Capital Account balance of each Member to equal the aggregate amount of Distributions such Member is entitled to under Section 4.2(c) hereof.

(b)    The Members intend that the allocation of Income and Loss as described above will produce final Capital Account balances of the Members that will equal the aggregate amount of liquidating Distributions such Member receives under Section 4.2 hereof. If such allocation provisions would fail to produce such final Capital Account balances, such tax allocation provisions may be amended by the Board of Managers in the sole discretion thereof, to the extent permitted or required by law, if and to the extent necessary to produce such result.

4.5    **Special Rules Regarding Allocation of Tax Items**. Notwithstanding the foregoing provisions of Article IV, the following special rules shall apply in allocating tax items of the Company:

(a)    **§ 704(c) and Revaluation Allocations.** In accordance with Code § 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with

11

KCP-4708754-8

respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Fair Value at the time of contribution. In the event of a Revaluation, subsequent allocations of income, gain, loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Fair Value immediately after the adjustment in the same manner as under Code § 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Board of Managers in a manner that reasonably reflects the purpose and intention of this Agreement; provided that, the Company shall adopt the remedial allocation method as contemplated in Treasury Regulation Section 1.704-3(d). Allocations pursuant to this Section 4.5(a) are solely for income tax purposes and shall not affect, or in any way be taken into account in computing, for book purposes, any Member's Capital Account or share of Income or Loss, pursuant to any provision of this Agreement.

**(b)    Minimum Gain Chargeback.** Notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during a Company taxable year, each Member shall be allocated items of income and gain for such year (and, if necessary, for subsequent years) in an amount equal to that Member's share of the net decrease in Company Minimum Gain during such year (hereinafter referred to as the "Minimum Gain Chargeback Requirement"). A Member's share of the net decrease in Company Minimum Gain is the amount of the total decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding taxable year. A Member is not subject to the Minimum Gain Chargeback Requirement to the extent: (i) the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing or other change in the debt instrument causing it to become partially or wholly recourse debt or a Member Nonrecourse Debt, and the Member bears the economic risk of loss for the newly guaranteed, refinanced or otherwise changed liability; (ii) the Member contributes capital to the Company that is used to repay the Nonrecourse Debt and the Member's share of the net decrease in Company Minimum Gain results from the repayment; or (iii) the Minimum Gain Chargeback Requirement would cause a distortion and the Commissioner of the Internal Revenue Service waives such requirement.

A Member's share of Company Minimum Gain shall be computed in accordance with Treasury Regulation § 1.704-2(g) and as of the end of any Company taxable year shall equal: (1) the sum of the Nonrecourse Deductions allocated to that Member up to that time and the distributions made to that Member up to that time of proceeds of a Nonrecourse Debt allocable to an increase of Company Minimum Gain, minus (2) the sum of that Member's aggregate share of net decrease in Company Minimum Gain plus that Member's aggregate share of decreases resulting from revaluations of Property subject to Nonrecourse Debts. In addition, a Member's share of Company Minimum Gain shall be adjusted for the conversion of recourse and Member Nonrecourse Debts into Nonrecourse Debts in accordance with Treasury Regulation § 1.704-2(g)(3). In

12

computing the above, amounts allocated or distributed to the Member's predecessor in interest shall be taken into account.

(c)     **Member Minimum Gain Chargeback.**  Notwithstanding any other provision of this Article IV other than Section 4.5(b), if there is a net decrease in Member Minimum Gain during a Company taxable year, each Member who has a share of the Member Minimum Gain (determined under Treasury Regulation § 1.704-2(i)(5) as of the beginning of the year) shall be allocated items of income and gain for such year (and, if necessary, for subsequent years) equal to that Member's share of the net decrease in Member Minimum Gain.  In accordance with Treasury Regulation § 1.704-2(i)(4), a Member is not subject to this Member Minimum Gain Chargeback requirement to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Debt due to a conversion, refinancing or other change in the debt instrument that causes it to be partially or wholly a Nonrecourse Debt.  The amount that would otherwise be subject to the Member Minimum Gain Chargeback requirement is added to the Member's share of Company Minimum Gain.

(d)     **Qualified Income Offset.**  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), that causes or increases such Member's Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation under this Section 4.5(d) shall be made if and only to the extent such Member would have an Adjusted Capital Account Deficit after all other allocations under this Article IV have been made.

(e)     **Nonrecourse Deductions.**  Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in proportion to their Membership Interests.

(f)     **Member Nonrecourse Deductions.**  Any Member Nonrecourse Deductions shall be allocated to the Member who bears the risk of loss with respect to the loan to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation § 1.704-2(i).

(g)     **Curative Allocations.**  Any special allocations of items of income, gain, deduction or loss pursuant to Sections 4.5(b), (c), (d), (e), (f), and (h) shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article IV, so that the net amount of any items so allocated and all other items allocated to each Member pursuant to this Article IV shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article IV if such adjustments, allocations or distributions had not occurred.  In addition, allocations pursuant to this Section 4.5(g) with respect to Nonrecourse Deductions in Section 4.5(e) and Member Nonrecourse Deductions in Section 4.5(f) shall be deferred to the extent the Members reasonably determine that such allocations are likely to be offset by subsequent allocations of Company Minimum Gain or Member Minimum Gain, respectively.

13

(h)    **Loss Allocation Limitation.**  Notwithstanding the other provisions of this Article IV, unless otherwise agreed to by all of the Members, no Member shall be allocated Loss in any taxable year that would cause or increase an Adjusted Capital Account Deficit as of the end of such taxable year.

(i)    **Share of Nonrecourse Liabilities.**  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulation § 1.752-3(a)(3), each Member's interest in Company profits is equal to such Member's respective Membership Interests.

(j)    **Compliance with Treasury Regulations.**  The foregoing provisions of this Section 4.5 are intended to comply with Treasury Regulation §§ 1.704-1(b), 1.704-2 and 1.752-1 through 1.752-5, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event it is determined by the Members that it is prudent or advisable to amend this Agreement in order comply with such Treasury Regulations, the Board of Managers, upon being so directed by the Members, is empowered to amend or modify this Agreement, notwithstanding any other provision of this Agreement.

(k)    **General Allocation Provisions.**  Except as otherwise provided in this Agreement, all items that are components of Income or Loss shall be divided among the Members in the same proportions as they share such Income or Loss, as the case may be, for the year.  For purposes of determining the Income, Loss or any other items for any period, Income, Loss or any such other items shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under Code § 706 and the Treasury Regulations thereunder.

**4.6**    **No Priority**.  Except as may be otherwise expressly provided herein, no Member shall have priority over any other Member as to Company capital, income, gain, deductions, loss, credits or distributions.

**4.7**    **Tax Withholding**.  Notwithstanding any other provision of this Agreement, the Board of Managers is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any withholding requirements established under any federal, state or local tax law, including, without limitation, withholding on any Distribution to any Member.  For all purposes of this Article IV, any amount withheld on any Distribution and paid over to the appropriate governmental body shall be treated as if such amount had in fact been distributed to the Member.

**4.8**    **Reserves**.  The Board of Managers shall establish, maintain and expend certain amounts ("Reserves") to provide for working capital, for the Members' Tax Distribution Amounts, for future maintenance, repair or replacement of the Property, for debt service, for future investments and for such other purposes as it may deem necessary or advisable.

14

**ARTICLE V**
**MANAGEMENT**

**5.1    Management**.

(a)    The business and affairs of the Company shall be managed by up to four (4) natural persons who shall be referred to as "Managers" and who, acting as a board, shall constitute the "Board of Managers," the Board of Managers initially shall be comprised of Donald Johnson, Larry Frascella, David Frascella, and James Carnes.  The Managers each shall hold office until such Manager's successor is duly elected or until such Manager's earlier death, resignation or removal (as provided below).  Managers need not be Members of the Company.  Except as expressly limited by law, the Articles or this Agreement, the business of the Company shall be controlled and managed by the Board of Managers.  The Board of Managers shall have and is vested with all powers and authorities, except as expressly limited by law, the Articles, or this Agreement, to do or cause to be done any and all lawful things for and in behalf of the Company, to exercise or cause to be exercised any or all of its powers, privileges and franchises, and to seek the effectuation of its objects and purposes.

(b)    One member of the Board of Managers shall serve as "Chair."  Larry Frascella shall initially serve as Chair until replaced by a majority vote of the Board of Managers.

(c)    The Board of Managers may designate officers and persons to act on behalf of the Company as the Board of Managers determines from time to time.  Any appointed officer shall serve at the pleasure of the Board of Managers and may be removed at the discretion of the Board of Managers.

(d)    The Board of Managers shall have a compensation committee which shall be comprised of Larry Frascella and David Frascella, who shall serve as the "Chair" of the compensation committee.  The compensation committee shall have the right to approve the hiring of any employee of the Company who is entitled to annual compensation (salary and bonus opportunity) in excess of $100,000 and shall approve the payment of any annual compensation (salary and bonus) to any employee in excess of $100,000.  In addition, the compensation committee shall recommend to the Board of Managers, any equity grants to any employee and the Board of Managers shall vote on the compensation committee's recommendation.  At all meetings of the compensation committee, all members of the committee then serving must be present to constitute a quorum for the transaction of business and the act of all of the members of the compensation committee shall be the act of the compensation committee.

(e)    The Board of Managers may from time to time create additional committees of the Board, including an audit committee.

**5.2    Election of the Board of Managers**.    In electing the Managers, each Member shall have the right to designate one (1) member of the Board of Managers.  Vacancies on the

Board of Managers shall be filled by the Member whose initial appointee is removed or resigns as a member of the Board of Managers.

**5.3    Meetings of the Board of Managers; Place of Meetings.**  Meetings of the Board of Managers shall be held at such times upon the call of any of the Managers.  All meetings of the Board of Managers shall be held at such time or place as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting or in a duly executed waiver of the notice thereof.  Managers may participate in a meeting of the Board of Managers by means of conference telephone equipment or similar communications equipment whereby all Managers participating in the meeting can hear each other and participation in a meeting in this manner shall constitute presence in person at the meeting.

**5.4    Quorum; Voting Requirement**.  At all meetings of the Board of Managers, all of the Managers then serving must be present to constitute a quorum for the transaction of business. The act of a majority in number of the Managers present at any meeting of the Board of Managers at which a quorum is present shall be the act of the Board of Managers. In the event a majority in number of the Managers present does not vote for or against a particular act, the vote of the Chair shall determine the outcome of such a spilt vote.

**5.5    Notice of Meeting**.  Notice of each meeting of the Board of Managers stating the place, day and hour of the meeting shall be given to each Manager at least twenty-four (24) hours before the time the meeting is to be held.  The notice may be given by any Manager having authority to call the meeting. "Notice" and "call" with respect to such meetings shall be deemed to be synonymous.

**5.6    Waiver of Notice**.  Whenever any notice is required to be given to any Manager under the provisions of this Agreement, a waiver thereof in writing signed by such Manager, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting except where a Manager attends a meeting for the express purposes of objecting to the transaction of any business because the meeting is not lawfully called or convened.

**5.7    Action Without a Meeting.**  Any action that is required to be or may be taken at a meeting of the Board of Managers may be taken without a meeting if consents in writing, setting forth the action so taken, are signed (including through electronic acknowledgement of an agreed to form of document) by all of the Managers. The consents shall have the same force and effect as a vote at a meeting duly held.

**5.8    Compensation of Managers**.  Managers shall receive expense reimbursement for reasonable out of pocket expenses for their service as such.

**5.9    Meetings of Members; Place of Meetings**.  Meetings of the Members shall be held at such times upon the call of any Member. Meetings of the Members shall not be required to be held on any regular frequency.  Meetings of the Members may be held for any purpose or purposes, unless otherwise prohibited by law or by the Articles.  All meetings of the Members shall be held at such time or place as shall be designated from time to time by the Members and stated in the notice of the meeting or in a duly executed waiver of the notice thereof.  Members

may participate in a meeting of the Members by means of conference telephone or similar communications equipment whereby all Members participating in the meeting can hear each other and participation in a meeting in this manner shall constitute presence in person at the meeting.

**5.10    Quorum; Voting Requirement.**  The presence, in person or by proxy, of a Majority in Interest shall constitute a quorum for the transaction of business by the Members. The affirmative vote of a Majority in Interest shall constitute a valid decision of the Members, except where a larger vote is required by this Agreement.

**5.11    Proxies.**  At any meeting of the Members, every Member having the right to vote thereat shall be entitled to vote in person or by proxy appointed by an instrument in writing signed by such Member and bearing a date not more than three years prior to such meeting.

**5.12    Action Without Meeting.**  Any action required or permitted to be taken at any meeting of the Members of the Company may be taken without a meeting if the action is evidenced by one or more written consents setting forth the action to be taken and signed by Members holding sufficient Membership Interests to approve such action at a duly held meeting as set forth in Section 5.10 above. The consents shall have the same force and effect as a vote at a meeting duly held.

**5.13    Notice of Meetings.**  Notice of a Meeting of the Members, stating the place, day, hour and the purpose for which the meeting is called shall be given not less than two (2) business days before the date of the meeting, by or at the direction of the Members calling the meeting, to each Member entitled to vote at such meeting. A Member's attendance at a meeting: (a) waives objection to lack of notice or defective notice of the meeting, unless such Member, at the beginning of the meeting, objects to holding the meeting or transacting business at the meeting; and (b) waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the notice of meeting, unless such Member objects to considering the matter when it is presented.

**5.14    Waiver of Notice.**  When any notice is required to be given to any Member of the Company hereunder, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

**5.15    Execution of Documents Filed with Department of State of Delaware and Waiver of Receipt of Copy of Filed Documents.**  Any Member or Manager shall be authorized to execute and file with the Secretary of State of Delaware any document permitted or required by the Act.  Such documents shall be executed and filed only after the Board of Managers (and as necessary, the Members) have approved or consented to such action in the manner provided herein.  The Members hereby waive any requirement under the Act of receiving a copy of any document filed with the Secretary of State of Delaware.

**5.16    Limitation of Liability; Indemnification.**

　　　　(a)    **Limitation.**  No Person shall be liable to the Company or its Members for any loss, damage, liability or expense suffered by the Company or its Members on account of

17

any action taken or omitted to be taken by such Person as a Manager of the Company or by such Person while serving at the request of the Company as a director, officer or in any other comparable position of any Other Enterprise, if such Person discharges such Person's duties in good faith, exercising the same degree of care and skill that a prudent person would have exercised under the circumstances in the conduct of such prudent person's own affairs, and in a manner such Person reasonably believes to be in the best interest of the Company. A Manager's liability hereunder shall be limited only for those actions taken or omitted to be taken by such Manager in the discharge of such Manager's obligations for the management of the business and affairs of the Company. The provisions of this subsection are not intended to limit the liability of any Manager for any obligations of such Manager undertaken in this Agreement in such Manager's capacity as a Member.

(b)    **Right to Indemnification.**  The Company shall indemnify each Person who has been or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or appellate (regardless of whether such action, suit or proceeding is by or in the right of the Company or by third parties) by reason of the fact that such Person is or was a Member (subject to the limitation stated below in this Section 5.16(b)), or Manager of the Company, or is or was serving at the request of the Company as a director, officer or in any other comparable position of any Other Enterprise against all liabilities and expenses, including, without limitation, judgments, amounts paid in settlement, attorneys' fees, excise taxes or penalties, fines and other expenses, actually and reasonably incurred by such Person in connection with such action, suit or proceeding (including, without limitation, the investigation, defense, settlement or appeal of such action, suit or proceeding); provided, however, that the Company shall not be required to indemnify or advance expenses to any Person from or on account of such Person's conduct that was finally adjudged to have been knowingly fraudulent, deliberately dishonest or willful misconduct; provided, further, that the Company shall not be required to indemnify or advance expenses to any Person in connection with an action, suit or proceeding initiated by such Person unless the initiation of such action, suit or proceeding was authorized in advance by the Board of Managers;  provided, further, that a Manager shall be indemnified hereunder only for those actions taken or omitted to be taken by such Manager in the discharge of such Manager's obligations for the management of the business and affairs of the Company and that the provisions of this Section 5.16 are not intended to extend indemnification to any Manager for any obligations of such Manager undertaken in this Agreement in such Manager's capacity as a Member.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction or under a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such Person's conduct was finally adjudged to have been knowingly fraudulent, deliberately dishonest or willful misconduct.

The indemnification provided in this Section 5.16(b) for a Member shall apply only with respect to claims asserted by third parties not affiliated with the Company or any Member.

(c)    **Enforcement of Indemnification.**  In the event the Company refuses to indemnify any Person who may be entitled to be indemnified or to have expenses advanced under this Section 5.16, such Person shall have the right to maintain an action in any court of competent jurisdiction against the Company to determine whether or not such Person is entitled

18

to such indemnification or advancement of expenses hereunder. If such court action is successful and the Person is determined to be entitled to such indemnification or advancement of expenses, such Person shall be reimbursed by the Company for all fees and expenses (including attorneys' fees) actually and reasonably incurred in connection with any such action (including, without limitation, the investigation, defense, settlement or appeal of such action).

(d)    **Advancement of Expenses.**    Expenses (including attorneys' fees) reasonably incurred in defending an action, suit or proceeding, whether civil, criminal, administrative, investigative or appellate, shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Person to repay such amount if it shall ultimately be determined that such Person is not entitled to indemnification by the Company. In no event shall any advance be made in instances where the Board of Managers or independent legal counsel reasonably determines that such Person would not be entitled to indemnification hereunder.

(e)    **Non-Exclusivity.**    The indemnification and the advancement of expenses provided by this Section 5.16 shall not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any statute, or any agreement, vote of Members, policy of insurance or otherwise, both as to action in their official capacity and as to action in another capacity while holding their respective offices, and shall not limit in any way any right that the Company may have to make additional indemnifications with respect to the same or different Persons or classes of Persons. The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 5.16 shall continue as to a Person who has ceased to be a Member or Manager of the Company, and as to a Person who has ceased serving at the request of the Company as a director, officer or in any other comparable position of any Other Enterprise and shall inure to the benefit of the heirs, executors and administrators of such Person.

(f)    **Amendment and Vesting of Rights.**    Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 5.16 shall not be amended or repealed and the rights to indemnification and advancement of expenses created hereunder shall not be changed, altered or terminated except by the approval of the Class A Members. The rights granted or created hereby shall be vested in each Person entitled to indemnification hereunder as a bargained for, contractual condition of such Person's being or serving or having served as a Member or Manager of the Company or serving at the request of the Company as a director, officer or in any other comparable position of any Other Enterprise and, while this Section 5.16 may be amended or repealed, no such amendment or repeal shall release, terminate or adversely affect the rights of such Person under this Section 5.16 with respect to any act taken or the failure to take any act by such Person prior to such amendment or repeal or with respect to any action, suit or proceeding with respect to such act or failure to act filed after such amendment or repeal.

(g)    **Definitions.**    For purposes of this Section 5.16, references to:

(i)    The "Company" shall include, in addition to the resulting or surviving limited liability company (or other entity), any constituent limited liability company (or other entity) (including any constituent of a constituent)

19

absorbed in a consolidation or merger so that any Person who is or was a member or manager of such constituent limited liability company (or other entity), or is or was serving at the request of such constituent limited liability company (or other entity) as a director, officer or in any other comparable position of any Other Enterprise shall stand in the same position under the provisions of this Section 5.16 with respect to the resulting or surviving limited liability company (or other entity) as such Person would if such Person had served the resulting or surviving limited liability company (or other entity) in the same capacity;

    **(ii)**    "fines" shall include any excise taxes assessed against a person with respect to an employee benefit plan;

    **(iii)**    "defense" shall include investigations of any threatened, pending or completed action, suit or proceeding as well as appeals thereof and shall also include any defensive assertion of a cross-claim or counterclaim; and

    **(iv)**    "serving at the request of the Company" shall include any service as a director, officer or in any other comparable position that imposes duties on, or involves services by, a Person with respect to an employee benefit plan, its participants, or beneficiaries; and a Person who acted in good faith and in a manner such Person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted "in the best interest of the Company" as referred to in this Section 5.16.

    **(h)**    **Severability.**  If any provision of this Section 5.16 or the application of any such provision to any Person or circumstance is held invalid, illegal or unenforceable for any reason whatsoever, the remaining provisions of this Section 5.16 and the application of such provision to other Persons or circumstances shall not be affected thereby and, to the fullest extent possible, the court finding such provision invalid, illegal or unenforceable shall modify and construe the provision so as to render it valid and enforceable as against all Persons and to give the maximum possible protection to Persons subject to indemnification hereby within the bounds of validity, legality and enforceability.

    **5.17**    **Other Business Ventures.**  Except as otherwise provided in this Section 5.17 or otherwise by contract between a Member (or an affiliate or related party of such Member) and the Company, the Members that are not employees of the Company (or affiliated with employees of the Company) may engage in, or possess an interest in, other business ventures of every nature and description, independently or with others, whether or not similar to or in competition with the business of the Company, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom.  Notwithstanding the foregoing, Donald Jonson may not engage in, or possess an interest in, be employed by, consult with, provide services to, lend money to or be in any way associated with any business or venture that competes with the Company; provided, however, the may continue to provide services to those companies set forth on Schedule B.

20

## ARTICLE VI
## ACCOUNTING AND BANK ACCOUNTS

**6.1    Fiscal Year.**  The fiscal year and taxable year of the Company shall end on December 31 of each year, unless a different year is required by the Code.

**6.2    Books and Records.**  At all times during the existence of the Company, the Company shall cause to be maintained full and accurate books of account, which shall reflect all Company transactions and be appropriate and adequate for the Company's business.  The books and records of the Company shall be maintained at the principal office of the Company.  Each Member (or such Member's designated representative) shall have the right during ordinary business hours and upon reasonable notice to inspect and copy (at such Member's own expense) all books and records of the Company.

**6.3    Financial Reports.**  Within thirty (30) days after the end of each fiscal year, there shall be prepared and delivered to each Member: a balance sheet as of the end of such month or year and related financial statements (including an income statement) for the month or year then ended, along with a complete financial reporting package acceptable to the Members.  Within sixty (60) days after the end of each fiscal year, there shall be prepared and delivered to each Member all information (including, without limitation, K-1s) with respect to the Company necessary for the preparation of the Members' Federal and state income tax returns.

**6.4    Tax Returns and Elections; Tax Matters Member.**  The Company shall cause to be prepared and timely filed all Federal, state and local income tax returns or other returns or statements required by applicable law.  The Company shall claim all deductions and make such elections for federal or state income tax purposes that the Board of Managers reasonably believe will produce the most favorable tax results for the Members.  James Carnes is hereby designated as the Company's "Tax Matters Member," to serve with respect to the Company in the same capacity as a "tax matters partner" as defined in the Code and the partnership representative for tax years after 2017, and in such capacity is hereby authorized and empowered to act for and represent the Company and each of the Members before the Internal Revenue Service in any audit or examination of any Company tax return and before any court selected by the Members for judicial review of any adjustment assessed by the Internal Revenue Service.  James Carnes does hereby accept such designation.  The Members specifically acknowledge, without limiting the general applicability of this Section, that the Tax Matters Member shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member with respect to any action taken by it in its capacity as a "Tax Matters Member."  All out-of-pocket expenses incurred by the Tax Matters Member in the capacity of "Tax Matters Member" shall be considered expenses of the Company for which the Tax Matters Member shall be entitled to full reimbursement.

**6.5    Section 754 Election.**  In the event a distribution of Company assets occurs that satisfies the provisions of Section 734 of the Code or in the event a transfer of Membership Interests occurs that satisfies the provisions of Section 743 of the Code, upon the determination of Class A Members or Board of Managers, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.

KCP-4708754-8

**6.6    Bank Accounts.**  All funds of the Company shall be deposited in a separate bank, money market or similar account(s) approved by the Board of Managers and in the Company's name.  Withdrawals therefrom shall be made only by persons authorized to do so by the Board of Managers.

**ARTICLE VII**
**TRANSFERS AND ISSUANCES OF MEMBERSHIP INTERESTS; WITHDRAWAL**

**7.1    Permitted Transfers.**

(a)    No Member shall have the right to Transfer (and to substitute the assignee as a Substitute Member) any of such Member's Membership Interests without the consent of the Board of Managers.

**7.2    Substitute Members.**  No assignee of all or part of a Member's Membership Interests shall become a Member in place of the Transferor (a "Substitute Member") unless and until:

(a)    The Transferor (if living) has stated such intention in the instrument of assignment;

(b)    The Transferee has executed an instrument accepting and adopting the terms and provisions of this Agreement;

(c)    The Transferor or Transferee has paid all reasonable expenses (including legal fees) of the Company in connection with the admission of the Transferee as a Substitute Member; provided that, except as expressly stated in this Agreement, the Transferor and Transferee will be jointly and severally obligated for such expenses;

(d)    If requested by the Company, the Transferee has provided, at his expenses, a legal opinion that such assignment is in compliance with applicable securities laws; and

(e)    In the case of a Transferee of a Restricted Member, the Board of Managers has approved the Transferee's admission as a Substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a Transferee, the Board of Managers shall cause this Agreement to be duly amended to reflect the admission of the Transferee as a Substitute Member.

**7.3    Effect of Admission as a Substitute Member.**  Unless and until admitted as a Substitute Member pursuant to Section 7.2, a Transferee shall not be entitled to exercise any rights of a Member in the Company, including the right to vote, grant approvals or give consents with respect to such Membership Interests, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records, but a Transferee shall only be entitled to receive, to the extent of the Membership Interests transferred to such Transferee, the Distributions to which the Transferor would be entitled.  A Transferee who has become a Substitute Member has, to the extent of the Membership Interests transferred

22

to such Transferee, all the rights and powers of the Member for whom such Transferee is substituted and is subject to the restrictions and liabilities of a Member under this Agreement and the Act.  Upon admission of a Transferee as a Substitute Member, the Transferor shall cease to be a Member of the Company to the extent of such Membership Interests.  A Person shall not cease to be a Member upon assignment of all of such Member's Membership Interests unless and until the Transferee becomes a Substitute Member.

**7.4    Additional Members and Membership Interests; Preemptive Rights.**  The Company may issue additional Membership Interests only upon the approval of the Board of Managers. In connection with any issuance of additional Class A Membership Interests in accordance with this Agreement, the Class A Members shall have preemptive rights to purchase their pro rata share, based on the relative ownership of Class A Membership Interests then outstanding, of new Class A Membership Interests that the Company may from time to time propose to sell or issue.  This preemptive right shall not apply to the issuance of Class B Membership Interests. Any issuance of additional Membership Interests shall dilute all Members on a pro rata basis.

**7.5    Redemption of Membership Interests .**  Subject to this Agreement, Membership Interests may be redeemed by the Company upon the agreement of the Board of Managers and the holder of the Membership Interests to be redeemed.  The Board of Managers shall cause Schedule A to this Agreement to be amended to reflect any adjustment in Membership Interests.

**7.6    Company Call Rights .**

**(a)**    Upon the death of a Member, the Company shall have the right, at its option, to call and purchase, and upon such call, the estate of such deceased Member shall have the obligation to sell to the Company, all of such deceased Member's Class A Membership Interests and Class B Membership Interests, as applicable, for an aggregate purchase price equal to the Fair Market Value of such Class A Membership Interests and Class B Membership Interests, as mutually determine by the Company and the estate of such deceased member or by the appraisal of a valuation firm that is mutually acceptable to the Company and the estate of the deceased Member.

**(b)**    If the Company's employment of Brent Morgan is terminated for Cause or if Mr. Morgan resigns from his employment with the Company, then the Company shall have the right, at its option, to call and purchase, and upon such call, Mr. Morgan shall have the obligation to sell to the Company, all of his Class A Membership Interests and Class B Membership Interests, as applicable, for an aggregate purchase price equal to the Fair Market Value of such Class A Membership Interests and Class B Membership Interests as reasonably determined in good faith by the Board of Managers. "Cause" means the occurrence of any of the following events, as reasonably determined by the Board of Managers of the Company: (i) the failure to perform such duties as are reasonably requested in good faith by the Board of Managers; (ii) gross negligence, recklessness or willful misconduct in the performance of duties; (iii) an act of dishonest, fraudulent or illegal conduct; (iv) the breach, by Mr. Morgan, of that certain Employment Agreement by and between the Company and Mr. Morgan, dated as of the date hereof; (v) the commission of violations of Company policy including, but not limited to,

23

policies on equal employment opportunity, non-discrimination, non-harassment, non-retaliation, and workplace violence; and (vi) the commission of violations of state or federal law or regulation in the performance of his duties to the Company.

(c)     If the Company has not realized (i) as of February 28, 2018, at least $250,000.00 in Net Income (as defined below) or (ii) as of February 28, 2019, at least $500,000.00 in Net Income, the Company shall have the right, at its option, to call and purchase, and upon such call and purchase, Mr. Morgan shall have the obligation to sell to the Company, all of his Class A Membership Interests. The aggregate purchase price upon exercise of such call shall be equal to four times the Net Income for the twelve calendar months completed prior to the date such call is exercised by the Company multiplied by Mr. Morgan's pro rata Membership Interest in the Company.  Net Income shall mean the revenues of the Company less all expenses as reasonably determined by the Board of Managers; provided, however, that any amounts paid to Donald Johnson, Larry Frascella, David Frascella or James Carnes for services rendered to the Company or in the form of Distributions shall not be deducted form revenues for the purposes of calculating Net Income.

**7.7    Withdrawal.**  No Member shall be permitted to withdraw from the Company.

## ARTICLE VIII
## DISSOLUTION AND TERMINATION

**8.1    Events Causing Dissolution.**  The Company shall be dissolved upon the first to occur of the following events:

(a)     Upon the approval of the Board of Managers.

(b)     Upon the entry of a decree of dissolution with respect to the Company by a court of competent jurisdiction.

(c)     When the Company is not the surviving entity in a merger or consolidation under the Act.

**8.2    Effect of Dissolution.**  Except with respect to the occurrence of an event referred to in Section 8.1(c), and except as otherwise provided in this Agreement, upon the dissolution of the Company, the Board of Managers shall take such actions as may be required pursuant to the Act and shall proceed to wind up, liquidate and terminate the business and affairs of the Company.  In connection with such winding up, the Board of Managers shall have the authority to liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining Fair Value therefor, to apply and distribute the proceeds of such liquidation and any remaining assets in accordance with the provisions of Section 8.3, and to do any and all acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation.

**8.3    Application of Proceeds.**  Upon dissolution and liquidation of the Company, the assets of the Company shall be applied and distributed in the order of priority set forth in Section 4.2.

## ARTICLE IX
## MISCELLANEOUS

**9.1    Title to the Property.**  Title to the Property shall be held in the name of the Company.  No Member shall individually have any ownership interest or rights in the Property, except indirectly by virtue of such Member's ownership of Membership Interests.  No Member shall have any right to seek or obtain a partition of the Property, nor shall any Member have the right to any specific assets of the Company upon the liquidation of or any distribution from the Company.

**9.2    Nature of Interest in the Company.**  Membership Interests shall be personal property for all purposes.

**9.3    Notices.**  Any notice, demand, request or other communication (a "Notice") required or permitted to be given by this Agreement or the Act to the Company, any Member, or any other Person shall be sufficient if in writing and if hand delivered or mailed by registered or certified mail to the Company at its principal office or to a Member or any other Person at the address of such Member or such other Person as it appears on the records of the Company or sent by facsimile transmission or electronic mail to the telephone number or e-mail address, if any, of the recipient's facsimile machine or e-mail device as such telephone number or electronic mail address appears on the records of the Company.  All Notices that are mailed shall be deemed to be given when deposited in the United States mail, postage prepaid.  All Notices that are hand delivered shall be deemed to be given upon delivery.  All Notices that are given by facsimile transmission or electronic mail shall be deemed to be given upon receipt, it being agreed that the burden of proving receipt shall be on the sender of such Notice and such burden shall not be satisfied by a transmission report generated by the sender's facsimile machine or e-mail device.

**9.4    Waiver of Default.**  No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by another Member hereunder shall be deemed or construed to be a consent or waiver with respect to any other breach or default by such Member of the same provision or any other provision of this Agreement.  Failure on the part of the Company or a Member to complain of any act or failure to act of another Member or to declare such other Member in default shall not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

**9.5    No Third Party Rights.**  Except for a Person entitled to indemnity hereunder, none of the provisions contained in this Agreement shall be for the benefit of or enforceable by any third parties, including, but not limited to, creditors of the Company; provided, however, the Company may enforce any rights granted to the Company under the Act, the Articles or this Agreement.

**9.6    Entire Agreement.**  This Agreement, together with the Articles, constitutes the entire agreement between the Members, in such capacity, relative to the formation, operation and continuation of the Company.  This Agreement will apply to any Membership Interests acquired after the date hereof by the parties to this Agreement or by parties that have formally adopted and agreed to abide by the terms of this Agreement.

KCP-4708754-8

**9.7    Amendments to Certificate of Formation and this Agreement.**

(a)    Except as otherwise provided herein, neither the Certificate of Formation nor this Agreement shall be modified or amended in any manner other than by the written agreement of a Majority in Interest at the time of such modification or amendment.

(b)    This Agreement may be amended by the Board of Managers, without any execution of such amendment by the Members, in order to reflect the occurrence of any of the following events provided that all of the conditions, if any, contained in the relevant sections of this Agreement with respect to such event have been satisfied:

(i)    an adjustment of the Membership Interests of the Company upon the admission of an additional Member, issuance of additional Membership Interests;

(ii)    the modification of this Agreement to comply with the relevant tax laws pursuant to Sections 3.3 or 4.5(j) hereof; and

(iii)    the admission of a Substitute Member (Section 7.3 hereof).

**9.8    Severability.**  In the event any provision of this Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

**9.9    Binding Agreement.**  Subject to the restrictions on the disposition of Membership Interests \herein contained, the provisions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

**9.10    Headings.**  The headings of the Articles and Sections of this Agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions hereof.

**9.11    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one agreement that is binding upon all of the parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

**9.12    Governing Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to conflicts of law principles.

**9.13    Remedies.**  In the event of a default by any party in the performance of any obligation undertaken in this Agreement, in addition to any other remedy available to the non-defaulting parties, the defaulting party shall pay to each of the non-defaulting parties all costs, damages, and expenses, including reasonable attorneys' fees, incurred by the non-defaulting parties as a result of such default. In the event that any dispute arises with respect to the enforcement, interpretation, or application of this Agreement and court proceedings are instituted

KCP-4708754-8

to resolve such dispute, the prevailing party in such court proceedings shall be entitled to recover from the non-prevailing party all costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred by the prevailing party in such court proceedings.

   **9.14    Waiver of Jury Trial.**  NO PARTY TO THIS AGREEMENT OR ANY ASSIGNEE, SUCCESSOR, HEIR OR PERSONAL REPRESENTATIVE OF A PARTY SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER AGREEMENTS OR THE DEALINGS OR THE RELATIONSHIP BETWEEN THE PARTIES.  NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS.   NO PARTY HERETO HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY HERETO THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

*[signature pages follow]*

KCP-4708754-8

**IN WITNESS WHEREOF**, each of the parties has executed this Agreement as of the day and year first written above.

MEMBERS:

_____
Donald Johnson

**LF FAMILY TRUST:**

_____
Larry Frascella, Trustee                    2/14/17

**DF FAMILY TRUST:**

_____
David Frascella, Trustee                    2/14/17

**MELISSA C. CARNES REVOCABLE TRUST U/T/A 2/__/2010:**

_____
Melissa C. Carnes, Trustee

_____
James R. Carnes, Trustee

**SIGMADELTA RESEARCH, LLC**

By: _____
Brent Morgan

Its: _____President_____

**JEMS VENTURE CAPITAL, LLC**

By: _____
Michael Schubiger

Its: _____

[*Signature Page to Arion Capital Management, LLC Operating Agreement*]

**IN WITNESS WHEREOF**, each of the parties has executed this Agreement as of the day and year first written above.

**MEMBERS:**

_____
Donald Johnson

**LF FAMILY TRUST:**

_____ 2/14/17
Larry Frascella, Trustee

**DF FAMILY TRUST:**

_____ 2/14/17
David Frascella, Trustee

**MELISSA C. CARNES REVOCABLE TRUST U/T/A 2/11/2010:**

_____
Melissa C. Carnes, Trustee

_____
James R. Carnes, Trustee

**SIGMADELTA RESEARCH, LLC**

By: _____
Brent Morgan

Its: _____

**JEMS VENTURE CAPITAL, LLC**

By: _____
Michael Schubiger

Its: Partner

[*Signature Page to Arion Capital Management, LLC Operating Agreement*]

## SCHEDULE A

| Member | Capital Account | Benchmark Amount | Membership Interests |
|---|---|---|---|
| **Class A Members** | | | |
| Donald Johnson | $0.00 | N/A | 28.00% |
| Larry Frascella | $200,000.00 | N/A | 19.67% |
| David Frascella | $0.00 | N/A | 19.67% |
| James Carnes | $0.00 | N/A | 19.66% |
| JEMS Venture Capital, LLC | $0.00 | N/A | 5.00% |
| SigmaDelta Research, LLC | $0.00 | N/A | 8.00% |
| **Class B Members** | | | |
| | | | |
| | | | |
| | | | |
| **TOTAL MEMBERSHIP INTERESTS** | | | 100% |

**SCHEDULE B**

Brian LeBlanc
Professor Steven Levitt
William Hassert
Landeau Group
Grosjean, Mankodi
Fernando Luna
Carver Zeljko
Peter Wagner
Richard Docherty
William and Michelle Gross.

Exhibit 3

January 28th, 2019

Brent Morgan
Sigma Delta Research
6900 S. Sandpiper Ave.
Tucson, Arizona 85746

Dear Brent Morgan:

Your employment with Arion Capital Management LLC ("Arion") will be officially terminated for cause on January 31, 2019, specifically because the company failed to reach the agreed upon benchmarks contained in the operating agreement to which you are a signatory.

As you may recall Section 7.6(b) defines "cause" to include "the failure to perform such duties as are reasonably requested in good faith by the Board of Managers". Arion incorporated benchmarks into its operating agreement that were based in large part on your assessment of what you could and could not do for the company as a Consultant. By signing that agreement you agreed that these benchmarks were reasonable. Despite this, you failed to achieve these goals in the time period to which you agreed.

Please review the confidentiality/non-disclosure obligations contained in your employment agreement. According to this agreement, you are not permitted to disclose any company trade secrets, practices, or methods of operation. Arion Capital Management LLC is entitled to take legal action if it is revealed that you disclosed trade secrets during or after employment. Further, please review the sections covering Non-Solicitation and Non-Competition both of which continue for two years after your termination. Finally, please review the Transition of Work section of the agreement which Arion may require you to perform.

As you are being terminated for cause, you will not receive severance payment for the remaining balance of leave pay you have accumulated. As you have obtained health care benefits on your own, no further premiums will be paid to you by Arion post termination. Your final paycheck will be sent to you via wire transfer to the bank account previously identified by you.

In addition to termination, any equity you may hold in the Company is forfeited in accordance with section 7.6(c) which reads:

"If the Company has not realized (i) as of February 28, 2018, at least $250,000.00 in Net Income (as defined below) or (ii) as of February 28, 2019, at least $500,000.00 in Net Income, the Company shall have the right, at its option, to call and purchase, and upon such call and purchase, Mr. Morgan shall have the obligation to sell to the Company, all of his Class A Membership Interests. The aggregate purchase price upon exercise of such call shall be equal to four times the Net Income for the twelve calendar months completed prior to the date such call is exercised by the Company multiplied by Mr. Morgan's pro rata Membership Interest in the Company. Net Income shall mean the revenues of the Company less all expenses as reasonably determined by the Board of Managers; provided, however, that any amounts paid to Donald Johnson, Larry Frascella, David Frascella or James Carnes for services

rendered to the Company or in the form of Distributions shall not be deducted form revenues for the purposes of calculating Net Income."

As the company has not realized any net income during the period in question, the purchase price of your interests is the nominal amount of $1.00.

We ask that you return any and all computer equipment, company files, telephones and any other items supplied by the Company by January 31, 2019.

Sincerely

Larry Frascella
Managing Member

# Exhibit 4



# Salmanson Goldshaw, P.C.

TWO PENN CENTER
1500 J.F.K. BLVD., SUITE 1230
PHILADELPHIA, PA 19102
215-640-0593
Fax: 215-640-0596
*www.salmangold.com*

**Michael J. Salmanson**
Direct Dial: 215-640-0594
msalmans@salmangold.com

**Scott B. Goldshaw**
Direct Dial: 215-640-0595
goldshaw@salmangold.com
Also admitted in NY & NJ

**Diane M. Yandach**
Direct Dial: 215-640-0598
dyandach@salmangold.com
Also admitted in NJ

July 8, 2021

Arion Capital Management
884 Town Center Drive
Langhorne, PA  19047
Attn: Larry Frascella

By e-mail: larry.frascella@gmail.com (read receipt requested)

Dear Mr. Frascella:

Please be advised that we represent Brent Morgan in regard to his claims for compensation pursuant to the Employment Agreement and Restrictive Covenants (At Will) dated February 14, 2017 (the "Employment Agreement").  Please allow this letter to serve as a formal demand for wages pursuant to the Pennsylvania Wage Payment & Collection Law (WPCL).

As you are no doubt aware, Mr. Morgan is entitled to severance in the amount of $150,000.00 ("Base Salary) unless his employment were terminated for Cause, as defined in the separate Operating Agreement.  Cause in turn is defined as follows:

> the occurrence of any of the following events, as reasonably determined by the Board of Managers of the Company: (i) the failure to perform such duties as are reasonably requested in good faith by the Board of Managers; (ii) gross negligence, recklessness or willful misconduct in the performance of duties; (iii) an act of dishonest, fraudulent or illegal conduct; (iv) the breach, by Mr. Morgan, of that certain Employment Agreement  by and between the Company and Mr. Morgan,  dated as of the date hereof; (v) the commission of violations of Company  policy including, but not limited  to, policies on equal employment opportunity, non-discrimination, non-harassment, non- retaliation, and workplace violence; and (vi) the commission of violations of state or federal law or regulation in the performance of his duties to the Company.

According to the termination letter of January 28, 2019, the Company only relied upon a single basis

Larry Frascella
July 8, 2021
Page 2

for concluding that Mr. Morgan's termination constituted cause, i.e., (i) the failure to perform such duties as are reasonably requested in good faith by the Board of Managers. The company claimed that this provision was triggered by Mr. Morgan's failure to reach agreed-upon benchmarks into the Operating Agreement. But even assuming, *arguendo* that Mr. Morgan was responsible for the Company not reaching its benchmarks (a dispute of fact), the failure to reach such benchmarks does not trigger the provisions of clause (i) in any event as a matter of law. As a result, the severance is due and owing. Such severance constitutes "wages" within the meaning of the WPCL. *Shaer v. Orthopaedic Surgeons of Central Pennsylvania, Ltd*, 2007 Pa. Super. 371, 938 A.2d 457 (Pa. Super. 2007).

In particular, four basic principles of contract construction compel the outcome that the severance is due and owing. First, given that the definition of Cause is in the Operating Agreement, any ambiguity will be construed against the Company, as Mr. Morgan was not the drafter of the Agreement. But more critically, pursuant to the doctrine of *noscitur a sociis,* i.e., that when describing a list of contractual provisions, any ambiguity in that list must be interpreted in the context of the remainder of the list:

> The ancient maxim ' *noscitur a sociis* ' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep." *Commonwealth ex rel. Fisher v. Philip Morris, Inc.,* 4 A.3d 749, 756 n.9 (Pa.Cmwlth. 2010). The principle of *noscitur a sociis* is applied to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words. . . ." *Gustafson v. Alloyd Co*., 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Pursuant to this rule, " the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it." *Ford Motor Company v. Unemployment Compensation Board of Review*, 168 Pa.Super. 446, 79 A.2d 121, 123 (Pa. Super. 1951).

*S.A. v. Pittsburgh Public School District*, 160 A.3d 940 (Pa.Cmwlth. 2017). Here, the subsections all describe levels of intentional misconduct or gross negligence. Mere failure to reach benchmarks without any finding of fault simply does not reach the same level of intentionality or misconduct. Third, the "for cause" provision constitutes a *de facto* forfeiture provision which is disfavored under Pennsylvania law, and which must be strictly construed. *Kalina v. Eckert,* 345 Pa. Super. 220, 497 A.2d 1385 (1985) Finally, the provision as a whole must be read to give effect to each of its subparts, and cannot be read to make any language unnecessary. If a mere failure to adequately perform is sufficient to trigger subparagraph (i), then (ii) is wholly superfluous.

Should Mr. Morgan prevail in a suit under the WPCL, he would be entitled not only to the contractual damages, but other damages as well. First, the WPCL provides for a *mandatory* award of attorneys' fees and costs to a prevailing employee, *Oberneder v. Link Computer Corp.,* 548 Pa. 201, 696 A.2d 148 (1977). which need not be in proportion to the claim (Indeed, I have on more than occasion gotten an attorneys' fee award under the WPCL in excess of the principal claim*). David S. Reilly, v. Philadelphia Electrical Equipment Company, Inc*., 154 A.3d 853 (Pa.Super. 2016). Second, the Court may impose a 25% liquidated damages award under the defendant proves, by clear and

Larry Frascella
July 8, 2021
Page 3

convincing evidence, the existence of a good faith dispute as to the amount owed. Andrews v. cross Atlantic Capital Partners, Inc. 2017 Pa. Super. 72; 158 A.3d 123 (Pa. Super. 2017).

In addition, the WPCL allows for personal civil and criminal liability under the broad definition of "employer" under the Act. Under the law, any and all relevant "policy making" individuals can be jointly and severally liable under the Act for any judgment.  The determination of whether someone can be liable is based on the decision not to pay; in this instance, the individual or individuals who determined that Mr. Morgan was terminated "for Cause" and thus not entitled to severance pay.  We assume, at a bare minimum, that you are a policy maker for this purpose.  Please advise whether other individuals of the Company played a role in the "for Cause" determination, and if so, the role they played, including whether a formal vote among the managers was taken.  In the event that others did play a role in the determination, we believe it appropriate for you to provide a copy of this demand letter to each such individual, so that they may evaluate their own risk of liability for the claim and respond appropriately.

I look forward to hearing from you either with a substantive response and/or, in the event that you deny the demand, whether counsel for the Company is willing to accept service of a complaint without formal service of process.  In the interim, please place a litigation hold on all documents reasonably likely to lead to the discovery of admissible evidence in a lawsuit, including but not limited to all documents related to my client's performance; all documents upon which the Company and any potential defendants relied in determining that my client's termination was "For Cause" and any and all correspondence (including e-mails, texts or any other form of electronic communication) between and among the relevant decision-makers relating to or memorializing the decision to terminate my client "for Cause."

Please provide a response within ten (10) business days of the date of this letter.  If we do not hear from you by then, we will assume you have no interest in an amicable resolution and will proceed accordingly.

Sincerely,

Michael J. Salmanson

# Exhibit 5



**Mike Salmanson <msalmans@salmangold.com>**

## Re: Brent Morgan - WPCL Demand for Severance

**Larry Frascella** <larry.frascella@gmail.com>                                                          Fri, Jul 16, 2021 at 5:20 PM
To: Mike Salmanson <msalmans@salmangold.com>

Mr.Salmanson,

This email is in response to your letter to me dated July 8th 2021 whereby you make totally unsubstantiated claims
of compensation due to Brent Morgan via Arion Capital Management.

You may not be fully aware of your client's actions (as well as his **total** lack of performance) that led to the final decision
of terminating him.

So, I have attached a screen shot of **just one example** that indicates the following and would be brought to bare in a
court proceeding.

1. Your client was caught lying numerous times about his progress and his conversations with LLC members

2. Your client was afforded a substantial amount of **added time** to complete milestones of which he did not even come
close to achieving.

3. Your client, realizing his shortcomings proceeded to engage in classic passive aggressive behavior.


Some not so good news...

I have also attached the 2019 and 2020 tax returns for ACM.

Inform your client that the company **did not** develop a profitable model (for its own client) to date.
And as you can see it in $1.5M + in debt.
It had no income. EVER.
The company has failed thus far.

And, there is a very high likelihood (80% chance) the company will be shuttered literally by the
end of the month.

So your timing is nothing short of interesting and your request is laughable.


At the end of the day, no one that ACM have engaged with has been able to produce a winning model.

So please tell your client not to take it to heart. This task is only for the most elite in multiple disciplines.

In closing I would like you to know that I have never responded to a letter like this from an attorney.


But I felt compelled to relay to you how ridiculous your claim is on ambiguity.


You should be ashamed of yourself.


Have a great weekend


LF

On Jul 8, 2021, at 11:05 AM, Mike Salmanson <msalmans@salmangold.com> wrote:

<WPCLdemandletter.pdf>

---

**3 attachments**





**Screen Shot 2021-07-16 at 3.03.01 PM.png**
108K

**2020 ARION CAPITAL MGMT TAX RETURNS.pdf**
677K

**2019 ARION CAPITAL MGMTTAX RETURNS.pdf**
580K

 **2019 ARION CAPITAL MGMTTAX RETURNS.pdf**
580K